No. 2581.

GREEN MASSENGALE v. THE STATE.

1. MURDER—INSANITY—CHARGE OF THE COURT.—Upon the issue of insanity interposed as a defense to a prosecution for murder, the trial court, after having instructed the jury that every man is supposed to be sane and responsible for his acts, until the contrary is shown to the satisfaction of the jury, instructed them in a subsequent paragraph that the burden of proof was upon the defendant to establish his insanity. The objection urged is that the paragraphs referred to make the presumption of sanity, and the burden of proving insanity too prominent. *Held*, that the objection is without merit, in view of the entire charge.

2. SAME—VERDICT.—Article 722 of the Code of Criminal Procedure, which provides that "when the defendant is acquitted on the ground of insanity, the jury shall so state in their verdict," is merely directory; and though its substance should be charged by the trial court in all cases involving the issue of insanity, still the omission to so charge, if without apparent injury to the accused, is not material error.

3. SAME—FACT CASE.—See the opinion in extenso, for the substance of evidence *held* sufficient to establish the insanity of the accused, and, therefore, insufficient to support a conviction for murder.

APPEAL from the District Court of Robertson. Tried below before the Hon. W. E. Collard.

The death penalty was assessed against the appellant upon his conviction in the first degree, for the murder of John Mitchell, in Robertson county, Texas, on the twenty-sixth day of April, 1887.

The counsel for the appellant has prefaced his able and interesting argument upon the issue of insanity with a statement of the facts as full and concise as can be made from the record.

*John E. Crawford*, for the appellant: On the twenty-sixth day of April, 1887, the deceased, John Mitchell, the appellant and the principal State witness, Bob Massengale, appellant's brother, were planting cotton in the south field of Mr. Ben Wheelis, about six miles northeasterly from Calvert in Robertson county, Texas, the two Massengales being hired hands working for Mitchell. Mitchell with a mule and plow was opening the ground; appellant with a sack of seed was following Mitchell planting, and the witness, Bob, with a mule and log was covering the seed. About ten o'clock in the morning Mitchell remarked to appellant that appellant was leaving too many skips in planting the seed. Appellant made no response, but about half an hour afterwards laid down his sack and went to the house, a few hundred yards away. Mitchell told witness to take appellant's sack and plant until appellant returned, which witness Bob did.

In a short while appellant returned and when within fifty yards of Bob and Mitchell (who were planting, going towards appellant, and appellant coming from the house meeting them) Bob saw a pistol in appellant's hand and asked Mitchell what appellant was going to do with that pistol. Mitchell replied: "I do not know; he must be crazy." Appellant came on up muttering and "rolling out the dams," and Mitchell ran around

his mule—appellant after him. The mule ran away and Mitchell ran from appellant and appellant ran after him about one hundred yards. Mitchell stopped and threw his hands up over his head, and appellant, being within five or six steps of Mitchell shot him in the left side of the head, the ball ranging downward. Mitchell fell and appellant walked off in a northerly direction towards the lane and public road. Mitchell got up and walked nearly to the house and was met by Mr. Ben Wheelis, his step-father, and assisted to the house. The lane and public road runs in front of the house on the south, and the south field where the parties were is across the lane from the house.

Appellant occupied a tenant house one hundred and twenty-five yards from the big house where Mitchell lived. This lane is the public road leading to Calvert, six miles distant, and the lane extends three miles from this house.

About three and one-half hours after the tragedy Mr. Ben Wheelis got in his buggy and started to Calvert after his wife, who was Mitchell's mother. About two and one-fourth miles from the house Wheelis met appellant in the lane and public road coming along, walking, from towards Calvert, and going towards where the tragedy occurred nearly four hours before. Wheelis spoke to appellant, but did not stop. Appellant said good evening as though nothing had happened, and passed on by Wheelis. Wheelis said to appellant: "Which way, Green?" Appellant replied, "I am going up the road," or something to that effect. This was nearly or about four hours after the tragedy, and was two and one-fourth miles from where it occurred, and three and three-fourth miles from Calvert, on a public highway and in a very thickly settled neighborhood. Wheelis drove on to Calvert, got his wife and came back, and again saw appellant about one and one-fourth miles from where he first met him. Appellant had turned out of the main road into an old road, and was about one hundred yards from the main public road and about the same distance from a house where some people lived. Wheelis said nothing to appellant this time, but went on to where Mitchell was.

The same evening about dark, Wheelis and Dick Brock were informed that appellant was in his house about one hundred and twenty-five yards distant from where Mitchell was at the big house, and Mr. Wheelis and Brock repaired to appellant's house to arrest him. The door was closed and they hailed at the door and heard appellant get off his bed as though he was lying down.

Appellant came to the door and opened it, when he was confronted by Mr. Wheelis with upraised gun. Appellant at first drew back a little but immediately came on out and walked in the face of guns and pistols directly up to Mr. Brock, who had his pistol in his right hand, and appellant gently took hold of Brock's left arm above the elbow, the appellant at the same time beating himself in the breast and praying. Appellant made no resistance and no attempt at escape, but was tied by Wheelis and Brock and carried to jail. Mitchell lived about one month and died from the effects of the shot.

Bob Massengale, the principal State's witness, on cross examination testified that for seven or eight months before the tragedy he had noticed a marked change in the mental condition and conduct of appellant; that appellant seemed depressed, with his head hung down, in a deep study, was absent minded, refused to talk, and sometimes when appellant would be laying off rows with a plow he would run one row clear across another and would not seem to know the mistake, and sometimes when directed to put manure around the hills of corn a certain distance on the rows, would go clear through to the end without stopping at the place where directed to stop, and would not seem to notice his mistake.

The above is a synopsis of the State's evidence.

The attorney appointed by the court to represent appellant interposed the plea of insanity, and the following is a synopsis of the evidence developed for the defense:

The witnesses for the State and appellant generally agreed that for several months before the homicide that the rumor was general in the neighborhood that appellant was going crazy. The following is evidence of acts and conduct of appellant prior to the tragedy:

Dick Brock met appellant on one occasion in a lane; appellant was walking, and before he got to Brock appellant climbed over a high fence and "shunned" around Brock, and after he had passed climbed back over the fence into the road again. On another occasion Brock saw appellant helping deceased kill hogs. Appellant seemed low spirited, seemed to be in a deep study, kept his head hung down, would not talk, and did everything in a mechanical manner. Witness remarked to appellant that he had heard that he (appellant) was going crazy. Appellant made no response. On another occasion appellant came to witness's house and acted very peculiarly; would not talk fur-

ther than to answer questions; seemed to be in dread. Witness noticed a change in appellant's conduct and mental condition from what it formerly had been.

Caroline Massengale, the mother of the appellant, testified that for some months before the homicide appellant refused to drink water out of the same bucket where the balance of the family drank, and would not eat with the family, but would cook his own victuals, go into a separate room, close the door and eat alone, and after finishing would scatter the fragments all over the room; and that appellant seemed droopy, would not talk, and on one occasion witness saw appellant sitting in his room on the side of the bed with his left hand partly raised and rapidly picking at the back of his left hand with the ends of his fingers of his right hand, and at the same time continually spitting, and seemed in a state of oblivion. At another time appellant fell down on the floor with something like a spasm. On one occasion appellant was seen going by the house of Wesley Bennett, walking with his hat in his hand; Bennett hailed appellant loud enough to be heard twice the distance, but appellant paid no attention to him. On another occasion appellant was passing the gin where Cal Murray was at work, and Murray went out to the road and tried to get into a conversation with appellant, but appellant refused to stop or talk. Albert Berkshire and Phillis Douglas testified to similar conduct.

It was proved by a number of respectable witnesses, and not denied or attempted to be controverted by the State, that appellant had, prior to the homicide, always borne the general reputation of a peaceable and quiet citizen, and was never known to have a difficulty before.

I insist that the court erred in not granting appellant a new trial because the existence of express malice was not proved beyond a reasonable doubt, and the proof of express malice is not sufficient to warrant a conviction of murder in the first degree.

The rule is that the existence of express malice must be clearly proved by the State, as any other fact, beyond a reasonable doubt in order to warrant a conviction of murder in the first degree. "While the law implies malice on proof of voluntary homicide, it does not impute express malice." (Farrar's case, 42 Texas, 272; Murray's case, 1 Texas Ct. App., 422; McCoy's case, 25 Texas, 33.)

The law governing the defense of insanity has been thoroughly and ably discussed by our present Court of Appeals in quite a

number of elaborate and learned opinions, in some of which the court has affirmed judgments of conviction for murder wherein the plea of insanity was interposed and not a little evidence adduced in support of the same. But from a hurried perusal of those cases we find this difference: that this case is most peculiar as to the manner of the homicide and the conduct of the appellant at the time and immediately after the act, and presents a most remarkable *absence* of any *motive* on the part of appellant to kill the deceased, and as the jury have shut their eyes and closed the doors of their hearts against our theory of the case, and have assessed the extreme penalty of death, this is perhaps sufficient apology for again presenting these questions for the most careful consideration of our criminal court of last resort.

My position is this: The remarkable circumstance of this homicide, with no provocation, no former difficulty, no former grudge, no threats, absolutely *no motive nor cause*, the manner of the killing in wildly running after deceased, the very peculiar conduct of appellant immediately afterwards in loitering along a public highway in a densely settled neighborhood near the scene of the tragedy, during the whole day after the shooting; his meeting Mr. Wheelis and his conduct at the time as though nothing had happened; his coming back to his room on the same premises only one hundred and twenty-five yards from where deceased was; his closing the door and laying down on the bed; his peculiar conduct when arrested in beating himself on the breast and praying and strangely taking hold of Brock's arm; no effort to escape; no resistance to the arrest, together with the fact that for several months prior to the tragedy there was a general rumor in the neighborhood that appellant was going crazy. (Which shows that it is no afterthought.) His peculiar conduct on different occasions as narrated by different witnesses, his refusing to talk, his oblivious moods, his droopy spirits, his refusing to eat and drink with others, his undenied reputation for peace and quiet, taken altogether and considered as an entirety, overwhelmingly rebut any proof of express malice, if in fact there is any such proof in the record, and as matter of law reduces the homicide to murder in the second degree, even upon the theory that the jury were right in finding that the insanity of appellant was not established by a preponderance of evidence, and that he should be punished.

Dr. Taylor, in his work on medical jurisprudence, speaking of homicidal insanity, says:

"Sometimes the impulse is long felt, but concealed and restrained. There may be merely signs of depression and melancholy, low spirits and loss of appetite, as well as eccentric or wayward habits, but nothing to lead to a suspicion of the fearful contention which may be going on within the mind. As in suicidal mania, many of those who are in habits of daily intercouse with the patients have been first astounded by the act of murder, and then only for the first time led to conjecture that certain peculiarities of language or conduct, scarcely noticed at the time, must have been symptoms of insanity.

"Occasionally the act of murder is perpetrated with great deliberation, and apparently with all the marks of sanity. These cases are rendered difficult by the fact that there may be no distinct proof of the existence, past or present, of any disorder of the mind; so that the chief evidence of mental disorder is the *act* itself." (Taylor's Med. Juris., 7th Amer. Ed., 784.)

The same writer says: "The existence of a morbid delusion can not always be allowed to screen a criminal from the consequences of his own acts, while, on the other hand, there are instances in which a plea of insanity may properly be allowed, although no delusion can be proved. Each case must be taken with all its surrounding circumstances, and legal theories of insanity are chiefly valuable, not as rigorous axioms of law, but as cautions to be observed by the jury." (Id., 782.)

This writer further says: "And if the rule suggested, that a person, in order to be acquitted on the ground of insanity, should be first proved to be as unconscious of his act as a baby, were strictly carried out, there is scarcely an inmate of an asylum, who happened to destroy a keeper or an attendant, who might not be executed for murder. Such a rule amounts to a *reductio ad absurdum;* it would abolish all distinction between the sane and the insane, between the responsible and the irresponsible; and it would consign to the same punishment the confirmed lunatic and the sane criminal." (Id., 783.)

A reference to the reported cases decided by our Court of Appeals, wherein the plea of insanity was interposed as a defense to murder, will show that each case presents unmistakable evidence of express malice and a motive for the homicide. (Webb v. The State, 5 Texas Ct. App., 596; and 9 Texas Ct. App., 490.) The appellant said deceased had done him dirt, and that he had

given deceased fourteen days to settle with him; hence he killed him, shooting deceased three times. The conviction was only for murder in the second degree. There was also some whisky mixed with the insanity.

In the case of McClackey v. State, 5 Texas Court of Appeals, 320, there is evidence of waylaying and of a former difficulty, and that the parties were deadly enemies. The conviction was for murder in the second degree.

In the case of Williams v. The State, 7 Texas Court of Appeals, 163, the evidence clearly showed that appellant charged criminal intimacy between deceased and the wife of appellant. Thus jealousy, the strongest motive known to the human heart, actuated appellant to commit the murder, and the conviction was for murder in the first degree, with death penalty.

In Clark v. State, 8 Texas Court of Appeals, 350, the evidence clearly shows that the cause of the homicide was adulterous intercourse between deceased and the wife of appellant. The conviction was second degree.

In the leading case of King v. State, 9 Texas Court of Appeals, 515, and reported again in 13 Id., 277, the evidence of express malice is strong. The deceased had filed two charges for libel against the accused. The parties were enemies. King threatened that deceased would not live two months. Said he had acted the damned rascal with him, and besides the evidence shows a waylaying.

In Warren v. State, 9 Texas Court of Appeals, 619, there was former difficulty, former grudges, jealousy as to deceased and appellant's wife, and that deceased was ambushed. Conviction for second degree.

In the case of Mendiola v. The State, 18 Texas Court of Appeals, 492, the evidence shows that a few days before the homicide defendant left the deceased apparently *very angry* about a pistol that had been pawned to deceased; also, that Mendiola waited in the office of deceased to kill him, and shot three times, and appeared very deliberate. This is strong evidence of express malice, and sustains a capital conviction.

In the case of Burkhard v. The State, 18 Texas Court of Appeals, 599, the deceased, who was defendant's wife, had filed suit for divorce against defendant on the ground of cruel treatment. Defendant had threatened the life of deceased, was jealous of deceased, had been drinking, etc.; also fired several shots, thus

showing malice express. The court says the evidence in this case fairly raises the issue of murder in the second degree.

In Smith v. The State, 19 Texas Court of Appeals, 95, and 22 Id., 316, defendant and deceased were gambling together. Deceased broke defendant and refused to loan him any more chips, and closed the game, whereupon defendant, who had been drinking, became enraged, threw some chips in the face of deceased, and then shot deceased twice. Conviction in second degree.

In the prominent case of Leache v. The State, 22 Texas Court of Appeals, 279, the evidence shows that Dr. Leache was drinking heavily, that he had a previous difficulty with deceased, and that deceased was forcibly taking him home against his will; that appellant becoming enraged, shot deceased and tried to shoot him again, and then said: "I have shot the d—d son of a bitch, and I wish I had killed him," and then tried to escape. Conviction in second degree.

These cases are reviewed to call attention to the difference between them and the case at bar. Each one of the above cases explains itself. The motive and malice is easily discovered. The manner of each of these homicides is consistent with sanity and guilt. But in this case we insist that the record presents a case inconsistent with sanity. It is a strange homicide. There is no motive, no malice, and the record fails to satisfy the mind. The mind is ready to ask for light outside of the record, and to inquire the cause of this tragedy. The only evidence that can be construed to be evidence of express malice is that deceased called attention of appellant to the fact that he was leaving skips in planting cotton seed, and appellant, with no response, thirty minutes later, quietly laid down his sack and went to the house, a few hundred yards distant, and returned with a pistol openly in his hand, muttering and rolling out the damns, and when deceased ran appellant ran after him one hundred yards, and when deceased stopped appellant shot him one time. Instead of this showing a sedate, deliberate mind, and formed desire to kill, it shows an insane impulse. It is inconsistent with sanity. Appellant making no response, waiting thirty minutes; and without a word laying down his sack and going, bringing the pistol in his hand, muttering, chasing deceased and shooting only once, are all evidences of insanity, and not evidence of express malice. Then the subsequent conduct of appellant and the other evidence of

insanity explains the tragedy and upon no other theory can the mind be satisfied or can the case be explained from the record.

In the case of Holmes v. The State, 20 Texas Court of Appeals, 110, is presented one of the most horrible tragedies on record. Holmes went in the night time into the house where deceased lived, and began to cut her and others to pieces with a knife, and when she ran to another room he ran after her and followed her into the yard, cutting until he killed her and another. There was the evidence of an old grudge, extreme bitterness and enmity of long standing, former quarrels, continued abuse, slanderous talk, which ordinarily are the strongest evidences of express malice, but the defendant's insanity was overwhelmingly established, and the court held in effect that instead of this being evidence of express malice it was evidence of a wild delusion, an insane impulse. Yet the jury convicted, and the court below sustained the same. We do not insist that the evidence of insanity is as strong in this case as in Holmes's case, but we do insist that the evidence of express malice is much stronger in Holmes's case than in this. Many of the features of Holmes's conduct are very similar to the conduct of appellant in this case. The rule, as laid down by our court, is that the defendant's insanity must be established by a preponderance of evidence to the satisfaction of the jury. Thus the rule varies as the bias, prejudice or intelligence of the jury varies, and depends upon the particular jury trying the particular case; hence each case must depend upon its own peculiar circumstances. The evidence in Holmes's case was not sufficiently clear to convince the minds and consciences of the jury of Holmes's insanity, yet the evidence was conclusive to the mind of the higher court, and it was held that defendant's insanity was established beyond question; and in this case the court can well say that the evidence falls short of express malice. Such a decision will not be against any precedent or change any rule, but will be in perfect harmony with the line of decisions in this State.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. On the twenty-sixth day of April, 1887, the defendant shot and wounded John Mitchell, and said Mitchell died from the effects of said wound about one month after it was inflicted. On July 23, 1887, the defendant was tried for said homicide and was convicted of murder in the first degree, and

the death penalty was assessed against him.    Defendant moved
the court to grant him a new trial, which motion having been
refused, he has prosecuted an appeal to this court.

On the trial of the case, counsel for the defendant (said coun-
sel having been appointed by the court, the defendant having
employed none to represent him) interposed in his behalf the
defense of insanity, insanity existing at the time of the commis-
sion of the homicide.    Upon this issue evidence was adduced
both by the State and in behalf of the defendant, and the court
in its charge to the jury explained the law relating to such issue
fairly, fully and correctly.    No exceptions were taken to the
charge at the time of the trial, but in this court counsel for the
defendant, while conceding that in the main the charge is a
good one, makes two objections to it:  First, because, after the
court in one paragraph of the charge had instructed the jury
that every man is supposed to be sane and responsible for his acts
until the contrary is shown to the satisfaction of the jury, it
again instructed them in a subsequent paragraph that the bur-
den of proof was upon the defendant to establish insanity.
Second, because the court omitted to instruct the jury that, if
they should acquit the defendant on the ground of insanity, they
should so state in their verdict.

With respect to the first objection to the charge, we do not
think it is a valid one.    In this particular, as in every other, the
charge expounds the law correctly, and, when considered in
connection with other portions of the charge upon the issue of
insanity, it can not be reasonably concluded that the legal pre-
sumption of sanity, and the burden of proving insanity, cor-
rectly explained to the jury, could have influenced the jury
prejudicially to the defendant.    It is not contended, and could
not be successfully, that these paragraphs of the charge do not
state the law correctly.    (Willson's Texas Crim. Law, sec. 85.)
The objection is, that said paragraphs make the presumption of
sanity and the burden of proving insanity too prominent.    We
do not think the objection is well made.

With respect to the second objection we do not regard it as a
substantial one.    While it is provided that "when the defendant
is acquitted on the ground of insanity, the jury shall so state in
their verdict" (Code Crim. Proc., art. 722), we think this provi-
sion is directory merely, and that, while it would be proper and
right for the court to instruct the jury in accordance therewith,
still, a failure to do so, when it does not appear that the rights

of the defendant were probably injured by such omission, should not be regarded as material error.

There is but one serious question presented in this case, and that is, Does the evidence sustain the conviction upon the issue of the defendant's insanity? We have given to the evidence a most careful and thorough consideration, and we are clearly of the opinion that the defense of insanity was sustained, and that the defendant should have been acquitted. We have arrived at · this conclusion upon the following facts and reasons:

The homicide can not be reasonably accounted for upon any other hypothesis than the insanity of the defendant. No motive whatever, for the act, is disclosed by the evidence. There had been no previous difficulty between the deceased and the defendant; they were friendly, and had never been otherwise. Defendant lived upon the premises of the deceased, and was employed as a farm laborer by deceased. They were working together in the field, planting cotton, the defendant sowing the cotton seed. Deceased remarked to defendant that he was making too many skips in sowing the seed. Defendant made no reply, but continued his work for half an hour, when he quit his work, went to his house, a few hundred yards distant, armed himself with a pistol, which he carried openly in his hand, returned to the field, and, as he approached where the deceased and another person (the brother of the defendant) were at work, he was muttering and, as the witness expressed it, "rolling out the damns." The witness, and the only eye witness of the tragedy, observing the pistol in defendant's hand, and hearing his mutterings, called the attention of deceased to defendant, and inquired what such conduct meant, and the deceased replied: "Green (meaning the defendant) must be crazy." Defendant continuing to approach deceased in the manner described, the deceased, evidently becoming alarmed, ran and defendant ran after him. When deceased had run about one hundred yards, he stopped, turned around and threw up his hands, when defendant, who was then about six feet distant, fired the pistol, wounding deceased in the head. Defendant then deliberately walked away and out of the field. We have recited the facts, substantially, immediately connected with the homicide, and as detailed by the brother of the defendant, the only person present at the time of the killing except the deceased and the defendant. And we will here remark that this witness, although the brother of the defendant, appears to have stated fully and truthfully the facts of this deplorable

occurrence.   The truth of his narrative has not been questioned in any particular, but is strongly corroborated by the other evidence.

What do these facts indicate and prove?   Do they show express malice?   Do they show a sedate and deliberate mind?   There has been no lying in wait, no antecedent menaces, no former grudges, no concerted schemes to do bodily injury to the deceased; in fact, the evidence discloses none of the usual *indicia* of malice except the apparently deliberate manner in which the homicide was committed.

It can not be reasonably concluded that malice was engendered in the mind of the defendant by the remark made to him by the deceased about the manner in which he was sowing the cotton seed.   Certainly no *sane* person would have taken offense at such a remark.   If this remark influenced the defendant, after half an hour's brooding over it, to quit his work, walk several hundred yards and back, and, in a strange, wild, unreasoning manner, take the life of his friend and employer, with whom he had lived and labored for months previous, and in whose employment he was then earning a livelihood, it is to our minds cogent evidence that his mind was diseased—his reason dethroned.   It indicates insanity—not malice—not a sedate and deliberate mind, but a mind wrecked, shattered, devoid of reason, beclouded by delusions, and the slave of wild, uncontrollable impulses.

If the facts we have recited were the only facts before us, our consciences would force us to conclude that the act was the offspring of an insane mind, and could not have resulted from a sedate and deliberate mind.   But the defense of insanity does not rest alone upon the evidence we have stated.   For six or seven months prior to the homicide, it was the general remark and rumor in the neighborhood in which the defendant lived, among those who associated with him and observed him closely, that his mental condition had undergone a marked change.   He had become taciturn, morose, unsocial, absent minded, listless, apparently deeply absorbed in thought, avoiding company and seeking solitude.   In short, it was rumored in the neighborhood that he was "going crazy."   And the evidence shows that the deceased was not only aware of this rumor, but he believed the truth of it; for, a short time before the homicide, he stated to a friend that the defendant was "going crazy," and, to establish his assertion, ordered the defendant to bring him a rail.   Defendant stood with head down and paid no attention to the order.

After a while, deceased said to him: "Green, I told you to bring me a rail." Defendant said: "Oh, I forgot," and went and brought the rail.

It is evident also from the conduct and language of the deceased at the time of the homicide that he believed that the defendant was insane. It was generally understood in the neighborhood, and had been so understood for six or seven months prior to the homicide, that the defendant was mentally changed, and several instances of strange and unusual conduct on his part, occurring prior to the homicide, and indicating mental derangement, are related by witnesses. His conduct immediately after the homicide, at the time of his arrest, and during his trial, likewise strongly support the defense of insanity. He made no effort to escape after he had committed the deed. He evinced no concern whatever about what he had done. He remained openly in the vicinity of the tragedy from ten o'clock in the morning until night, and then went to his house, within a short distance of where his victim was, and went to bed. No one arrested or attempted to arrest him during the day, although it was known to several what he had done, and that he was in the immediate vicinity. We can only account for this strange unconcern on the part of the defendant, and of the community, upon the theory of defendant's insanity, and the belief on the part of the community that he was insane. If he had been *sane*, having every opportunity to escape, he certainly would have yielded to the instinct of self preservation and sought safety in flight or concealment. Had the people of that community believed him to be sane, it is indeed strange that they did not immediately arrest him and secure his safe keeping to answer for his crime. Sane men, when they perpetrate such unprovoked and atrocious deeds as the defendant had perpetrated, are not usually permitted to wander at will in the vicinity of their crime and in the presence of the society which they have outraged.

While this court is slow to disturb the verdict of a jury upon the ground that it is not warranted by the evidence, it can never give its assent to a verdict which forfeits the life of a human being when the evidence plainly shows, or even preponderates in favor of the theory, that the act committed was conceived and executed by an insane, irresponsible mind. It would be a foul blot upon the records of justice and of the law to visit the extreme punishment of death upon one who has already been visited by a misfortune greater than death, one whose reason

has been dethroned, whose mind has been wrecked, whose power to choose between right and wrong has been destroyed. In the case before us, we think the insanity of the defendant was clearly established by the evidence, and that the verdict of the jury is contrary to the evidence; and the trial judge erred in not setting aside the verdict upon the motion of defendant's counsel, and because of this error the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered November 9, 1887.