### JIM FISHER v. THE STATE.

*No. 3911.    Decided December 2.*

1. **Practice—Continuance—Insanity.**—On a trial for murder, where the defense was insanity, defendant moved for a continuance for five absent witnesses. It was shown that two of said witnesses testified at the trial; the third was present, tendered to, but excused by defendant. The fourth was a party who had been confined in jail with defendant after the murder, was a stranger in the country, and who had been discharged from custody and his whereabouts was unknown. The fifth witness, one Mrs. H., was expected to testify that she believed defendant insane. The facts expected to be proved by these witnesses were, that they had known defendant for some time; that they had often seen him spring up suddenly and fight at and run from some imaginary danger; that at times he was very morose. It was established by the defendant that he was a somnambulist, and addicted to self-pollution. That somnambulism was not an indication of insanity. *Held*, that the application for continuance was properly overruled.

2. **Murder — Insanity — Evidence.**— Defendant's guilt of the crime of murder was unquestionable, provided his insanity was not established. Upon this point the evidence adduced was mainly that defendant had told his sister, who was the wife of the deceased, that deceased was in the habit of improper and illicit intercourse with her daughter and deceased's daughter, who was a child not quite 10 years old. That defendant had told this to other parties also. That defendant admitted to his sister that he himself had endeavored to have improper relations with the child. *Held*, in view of the facts that there was strong presumption that defendant desired to bring about a separation between his sister and her husband, and failing in this he feared that the wife would tell her husband of defendant's attempts at improper relation with their child, and that the husband and father would kill him on account thereof, and that actuated by these fears he killed deceased. *Held,* that the evidence did not establish insanity

3. **Insanity—Burden of Proof of.**—Every person is presumed of sane mind until the contrary is shown, and when insanity is relied on as defense the burden is upon defendant to establish such defense by a preponderance of evidence. See evidence stated in the opinion held wholly insufficient to establish a defense of insanity.

4. **New Trial—Newly Discovered Evidence.**—"In order to obtain a new trial on the ground of newly discovered evidence, it is incumbent on the defendant to satisfy the court that the evidence has come to his knowledge since the trial; that it was not owing to a want of diligence on his part that it was not discovered sooner; that, on another trial it must show that such evidence would probably produce a different result; and that it is competent, material to the issue, going to the merits; not merely cumulative, corroborative, collateral, or to impeach a witness. If the application is defective in establishing any of these essentials, a new trial will be refused."

APPEAL from the District Court of Delta. Tried below before Hon. E. W. Terhune.

The appellant was indicted for the murder of one Austin Hardy, who was his brother-in-law. The only defense was insanity. At the trial he was convicted of murder in the first degree, and his punishment assessed by the verdict and judgment at death.

All the essential facts are stated in the opinion.

No brief on file for appellant.

*R. H. Harrison,* Assistant Attorney-General, and *Howard Templeton,* District Attorney of the Eighth Judicial District, for the State, filed an able brief and written argument.

DAVIDSON, JUDGE.—Appellant was convicted of the murder of Austin Hardy on July 5, 1891, and the jury assessed against him the death penalty.

There was an application for a continuance made by appellant for the testimony of several witnesses who were alleged to be absent. They were five in number. Two of these—Dr. Becton and Brownlow Coston— testified on the trial, and another, Mrs. Patterson, was tendered to and

excused by appellant. The remaining two—Mrs. Hollon and Charles Green—did not attend.

Green was a stranger to defendant, and never met him until during the month of September subsequent to the homicide; was in jail a short time with him, was discharged therefrom, and has disappeared from the country. It may be further stated of this witness, that he was a stranger, transiently in the county of the homicide, and while there was arrested for felony, placed in jail with the defendant, and was discharged shortly thereafter, and upon his discharge from custody disappeared, and the officers have been unable to ascertain his whereabouts since that time. The facts expected to be proved by him are alleged to extend over a space of time both prior and subsequent to the date of the homicide. It is clear that the court did not err in overruling the application as to this witness.

By all of these witnesses except Dr. Becton appellant expected to prove, "that they have known defendant for some time, and that before and since the 5th of July, 1891, they have seen defendant act and talk like an insane person; that frequently at night and in day-time defendant did in the presence of said witnesses suddenly get up, fight at, and run from some imaginary danger, and afterward would cool down and become calm, and at times morose; that said witnesses will testify that defendant was regarded by them, from said acts and declarations, as of unsound mind."

The evidence shows beyond dispute, and was not controverted by the State, that defendant was a somnambulist, and would make noises in his sleep, get up and move about in his sleep, and do such other things as that character of persons do under similar circumstances. It is also equally established that "somnambulism is not insanity," and "it is not an indication of insanity." It was upon this state of case that Mrs. Hollon was expected to testify that she believed defendant to be insane. Had she so stated, it is not probable that the jury would have believed her conclusion and opinion to be correct in the face of the other testimony to the effect that somnambulism is not a symptom or evidence of insanity. The court properly overruled the application for a continuance.

Appellant's second contention is the insufficiency of the evidence to support the verdict of the jury. The undisputed evidence is, that defendant and deceased were brothers-in-law; that the defendant had lived with the deceased for some months prior to the homicide, at least most of the time during said months, and that the homicide occurred on July 5, 1891, on the premises of the deceased, in a corn field. The facts show a cold-blooded and heartless killing, and these facts are also undisputed, unless the defendant was insane at the time of the homicide.

The only defense set up or attempted to be proved on the trial was an effort to establish the insanity of the defendant. This was really the only contested issue before the jury. No evidence offered by the

defendant upon the issue was excluded.   It was all admitted as offered.
The theory of insanity was based upon the statements of defendant
prior and subsequent to the killing, that the deceased had been having
illicit intercourse with his own daughter, a child less than 10 years of
age, and who was a niece of the defendant.

A recapitulation of the salient features of this evidence should be
stated in order to understand the case.   About two months before the
homicide defendant went to Mrs. Hardy and desired to impart to her
a secret.   She declined to hear it, and informed her brother that she
was "a poor hand" to keep secrets.   He insisted, however, that she
should hear it, and should promise not to tell it to any one.   Finally
she agreed, and heard his story.

She thus testified :.  "He told me that he had tried to have improper
intercourse with my daughter, and could have done so, but that he
quit, and did not.   That my husband, Mr. Hardy, had been keeping
her.   I said to him, 'Jim, you must be crazy.'   He replied that he was
not as crazy as I was, and could prove what he had charged to me if I
would give him a chance.   I told him I did not believe it was true, so
far as he was concerned, and I knew it was not true so far as Mr. Hardy
was concerned.   He told me Mr. Hardy treated Alma, who was my
oldest daughter, better than the other children; and that he (defend-
ant) heard strange noises at night; and if I would but look and listen
I could hear and see the same thing.   From these things he knew Mr.
Hardy was criminally intimate with Alma.   I knew it was not so, and
did not tell Mr. Hardy, because I knew he would not take it, and it
would cause trouble between him and my brother.   Defendant men-
tioned this to me several times after that before the killing.   *   *   *
I never saw and never suspected anything wrong between Mr. Hardy
and the child.

After that defendant talked to me about this several times; in fact,
every time he found me alone away from the house.   *   *   *   One
day defendant came to me, and pretended to be terribly hurt, and I
told him I would hear no more of it; and he got down on his knees,
and cried a little about my refusing to hear him.   I did not believe
there was any truth in defendant's statement.   Alma lacked ten days
of being 10 years old the day Mr. Hardy was killed.   *   *   *   Every
time defendant talked to me about Mr. Hardy being too intimate with
Alma he cautioned me to keep it secret.   He said he had done no good
talking to me, as I would not believe it, and he was liable to be mur-
dered.   He told me this after he had mentioned the matter to me sev-
eral times, when I told him I was tired of it; I did not want to hear
any more about it.

"I know Alma got into defendant's bed by finding her there next
morning.   She complained of being cold, and said she went to his bed

on that account. After the killing she told me of defendant's attempted intimacy with her."

Alma Hardy testified: "I was 10 years old July 15, 1891. Defendant is my uncle, and lived with us several months before he killed my father. * * * I never told defendant nor mother that my father had been too intimate with me, because he never was. * * * Defendant never said anything out of the way to me. Once we were in bed together. I went to his bed. He was not asleep. He always slept in the same room, and one of my little sisters slept with him, and a little brother with me; and father and mother slept in an adjoining room. The night in question my little brother was in Uncle Jim's bed also. I don't know why I went to his bed. I remained in his bed all night. I never told mother about this until just before the first court after the killing."

Just after the homicide, and before this witness knew of it, the defendant, on leaving the place of the killing, met her coming from a neighbor's, where she had been for milk, on her return home, in company with other girls, and asked her "to go down in the woods with him. He never said anything more to me until we left the other girls. He then asked me to say that my father had been too intimate with me. I told him I would not do so. He insisted that I should do so, but I refused. He asked me if I had not been too intimate with father, and I said 'No.' He said he thought father had been too intimate with me. I said he had not. He urged upon me to admit it, but I refused, because it was not so. I don't know whether he was awake at the time I got into his bed or not. He was afterward awake. Defendant pulled up my clothing with his hands, and put his hands upon my private parts, and took his private organ, and put it on me, against my private parts, and pushed a little. He held it there a short time. He never said a word." The conversation in which defendant sought to induce this witness to admit her father's intimacy with her occurred a few moments after the killing.

Coston testified, that while they were in jail together he heard defendant say "that some other parties, men and boys, were guilty of criminal intimacy with the Hardy girls; and if he could get out he could prove it."

Defendant rode in a hack with one Reeves, and asked him what he "thought should be done with a man who would have intercourse with his own daughter. He said he knew of one or two men who did so, and seemed bothered about it. * * * He said a man who would do so ought to be hung or killed." He was drinking on this occasion.

Defendant on another occasion went to see Dr. Becton. This witness said defendant "seemed a little confused, and asked me if a man had anything to do with a girl 9 or 10 years old would it hurt her. I told him a man could not have intercourse with a girl at that age. He

said it had been done already. I said if it had been done, and did not hurt her when done, it would not hurt her now. He said two men had already done so. I looked him in the eye, and said, 'Have you been ruining a girl?' He said, 'No;' it was a niece. That he had offered her $100 to tell him, and she admitted it. I told him that was not what he came to see me for; that I was busy; and for him to state his business. He said, 'No,' that was not the purpose of his visit. He then said that when he was young he had got in the habit of playing with himself, and he wanted me to treat him for it. * * * Defendant had no appearance of insanity, but seemed confused or embarrassed, or in some sort of trouble."

Further testifying, this witness as an expert said: "It is impossible to tell what a man imagines or what he thinks. The general disposition of a masturbator is harmless and inoffensive. From what I know of defendant and the evidence in the case, there is nothing to indicate that he is not sane now. As an expert, from the evidence, I would say he is sane. He is nervous, dyspeptic, a masturbator; but not insane. I would say he is unhappy and morose, but is not insane. Strip the case of everything but the isolated fact that he killed Hardy under the unfounded belief that Hardy was too intimate with his child, and from that act alone I would say the killing was not the act of an insane man."

The father of defendant testified, that he had "never regarded defendant as right. * * * I don't believe defendant is right exactly, but I can not decide whether he knew it was wrong to kill a man or not. I don't know whether he was insane to that extent or not."

All the remaining witnesses who spoke to the question of insanity regarded defendant as sane. Among those who testified for the defense were several of his relations. Armstrong testified, that he had known the defendant three or four years, and never saw anything unusual about his conduct. This witness was not related to defendant. Dingler testified, that the father of defendant, on the day of the homicide, said to him that defendant was not insane. He said that he never noticed any indications of insanity about him. "I remarked, 'Uncle George, Jim must surely be crazy.' He said, 'No,' he seemed to be as rational as he ever was." Defendant was at a picnic on July 4, playing poker, and there was nothing peculiar about him. W. D. Hollon, a brother-in-law, testified for the defendant as to events transpiring just immediately preceding and succeeding the difficulty. "My wife and myself were at Mr. Hardy's at the time of the killing. I first saw the defendant after he came through the gate on the way to the field where Mr. Hardy was. After ten or fifteen minutes I heard two shots, and wife and I started out there. * * * I turned her back to the house. I heard Mrs. Hardy call for water and camphor, and went to the house and got it, and back to where Hardy was shot. On

the way I met defendant. He had no arms that I saw. I spoke, and said it was a warm morning. He said, 'Yes,' and passed on toward the gate, going out. * * * He walked tolerably fast as he left. Mrs Hardy had sent Alma to Mrs. Moore's after milk. I knew of no ill will between defendant and Hardy until after the shooting." This witness testified to defendant's sanity.

Defendant secured the pistol at his father's residence. After the homicide he returned to his father's with the pistol on his person, and he tried to induce defendant to give it to him, or put it away. This he refused to do, and assigned as a reason that he was going to Cooper, and they might try to mob him. He also stated to his father that he would be hung for the crime. He took dinner at his father's the day of the killing and subsequent thereto, and gave an account of the killing

The court charged the jury fairly and fully the law of this phase of the case. Insanity is a question of fact to be passed on by the jury under appropriate instructions from the court. Is the verdict contrary to the evidence? The insanity theory is based upon the unnatural thought conceived by defendant that a father could be guilty of such an atrocity as an incestuous intercourse with his own daughter, and it is contended that the idea constituted a delusion, because of the utter improbability of the conjecture and belief of the defendant, inasmuch as the girl was of such extreme youthful age.

It is further urged that the alleged self-pollution on his part was an additional fact strengthening the theory of insanity. On the other hand, the prosecution contends the evidence discloses defendant to have been in the full possession of his intellectual faculties, and that he acted upon a well laid, rational plan and scheme to take the life of deceased.

It is also contended by the State he feared the mistreatment of his little niece would be discovered, and in consequence thereof deceased would call him to account for his conduct toward and treatment of her; that the secret imparted to Mrs. Hardy by defendant was so imparted for the ulterior design of separating husband and wife; and that, failing in this, Mrs. Hardy would inform her husband of the matter, who would then kill him; and that he killed the deceased on account of these matters; and that in all of his acts and statements as to the alleged illicit intercourse on the part of deceased with his daughter defendant looked to and embraced the homicide and his subsequent defense of insanity.

We are of opinion that the matters were fairly submitted to the jury, and we would not be justified in setting aside the verdict.

One of the grounds for a new trial urged by the defendant was the newly discovered evidence of Dr. Henry. By this witness it was proposed to be shown that in his opinion the defendant was insane. It is

shown by the facts adduced on the trial of this motion that Dr. Henry and one of defendant's counsel, while on a fishing excursion prior to the trial, discussed the insanity phase of this case to some extent. This witness was present during most of the time this case was being tried, and heard the witnesses testify, except when the State was examining witnesses in rebuttal, and while Hollon was testifying for defendant. Defendant and his counsel knew of his presence in the court room, and defendant's counsel gave him a seat "inside the bar," which he accepted. The court, in conversation with the same counsel, called his attention to the fact "that Dr. Henry was a physician of experience and a Campbellite preacher, and had heard all the evidence in the case, and, as some of the jury were Campbellites, his testimony would doubtless be beneficial to the State or the defendant, whichever side he might favor in his opinion as an expert;" to which counsel replied, "that he knew Dr. Henry was a physician and had been present, for he had given him a seat" It was further shown, that "said counsel did not offer him the seat to use him as a witness, and did not think of using him until after the conviction. It was further shown that defendant had six physicians summoned as experts, but only examined one," etc

It is made apparent by this statement that the evidence does not come within any rule announced for obtaining a new trial for alleged newly discovered testimony. Neither defendant nor his counsel made affidavit that the same was newly discovered, and the facts show it was not.

In order to obtain new trials on this ground, it is incumbent on the defendant to satisfy the court that the evidence has come to his knowledge since the trial; that it was not owing to a want of diligence on his part that it was not discovered sooner; that on another trial it must show that such evidence would probably produce a different result; and that it is competent, material to the issue, going to the merits, not merely cumulative, corroborative, collateral, or to impeach a witness. If the application is defective in establishing any of these essentials, a new trial will be refused. Willson's Crim. Stats., sec. 2544, for collated authorities. The court did not err in overruling the motion for a new trial.

The charge asked by the defendant was properly refused. The substance of this charge was to require the State to assume the burden of proof, and show affirmatively that defendant was sane at the time of the homicide, provided there was any evidence tending to establish insanity. The rule upon the subject in this State is, that every person is presumed of sane mind until the contrary is shown, and when insanity is relied on as a defense the burden is upon the defendant to establish such defense by a preponderance of evidence. Id., sec. 85.

After a careful revision of this record we are of opinion that defendant has had a fair and impartial trial, that no reversible error was committed, and that the judgment should be affirmed.

*Affirmed.*

Judges all present and concurring.