## R. H. BURGESS v. THE STATE.

### No. 3755. Decided November 17, 1915.

### Motion for rehearing denied January 12, 1916.

**1.—Murder—Death Penalty—Sufficiency of the Evidence.**

Where, upon trial of murder and a conviction thereof assessing the death penalty, the evidence was sufficient under a proper charge of the court to sustain the conviction, there was no reversible error.

**2.—Same—Insanity—Use of Intoxicating Liquors—Charge of Court.**

Where, upon trial of murder, the evidence barely suggested that the defendant, at the time of the killing, possibly might have been insane from the long use of intoxicating liquor, but the court charged in the proper manner on the issue of insanity and no ·exceptions were taken thereto, there was no reversible error in refusing defendant's requested charge to acquit defendant if he had become insane from the long continued and recent use of intoxicating liquor.

**3.—Same—Evidence—Clothes of Deceased.**

Where, upon trial of murder, there was a question as to the exact location of the wounds, there was no reversible error to introduce in evidence the clothes of deceased, in the absence of any argument to the jury thereon.

**4.—Same—Evidence—Dying Declarations—Signature.**

Where, upon trial of murder, the State introduced in evidence the dying declarations of the deceased which were signed by her penmark, she being too weak at the time to write her name, and the declarations being otherwise suffi-

cient, there was no reversible error; besides, said statement did not appear in the record.

### 5.—Same—Newly Discovered Evidence.

Where the alleged newly discovered evidence did not come within the scope of the rule allowing a new trial for newly discovered evidence, the motion for a new trial on that ground was correctly overruled.

### 6.—Same—Clothes of Deceased—Location of Wounds.

Where, upon motion for rehearing, appellant contended that the testimony of the only eye-witness for the State was unreliable, especially as to the position of the deceased when she was shot, and there was a difference of opinion among the medical experts as to the exit and entrance of the bullet holes in the body of the deceased, there was no error in introducing in evidence the clothes of the deceased upon this point.

### 7.—Same—Requested Charge—Insanity—Intoxicating Liquors.

Where counsel for appellant on motion for rehearing contended that the appellant was insane at the time of the alleged offense from the long continued and recent use of intoxicating liquors, and that he was incapable to exercise diligence in securing witnesses to show his then insanity, but the record did not bear out their contention, and the court committed no reversible error in failing to submit their requested charge on insanity on the ground of insanity for the continued and recent use of intoxicating liquors, there was no reversible error.

### 8.—Same—Rule Stated—Sanity—Presumption—Burden of Proof.

The rule of law is that every person is presumed to be of sane mind until the contrary is shown. Following Fisher v. State, 30 Texas Crim. App., 502, and other cases. The accused has the burden of proving insanity by a preponderance of evidence. Following Roberts v. State, 67 Texas Crim. Rep., 580.

### 9.—Same—Statutes Construed.

Under the statute neither intoxication nor temporary insanity produced by the voluntary recent use of ardent spirits constitute any excuse for the commission of crime or the mitigation of punishment, and where, upon trial of murder, there was no evidence tending to show that defendant was drunk, or even drinking, at the time he killed the deceased, nor at any time recently theretofore, there was no reversible error on that ground; although the court submitted a charge on insanity, and defendant could not complain. Following Christian v. State, 71 Texas Crim. Rep., 566, and other cases.

Appeal from the District Court of Jefferson. Tried below before the Hon. John M. Conley.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*Crockett Williams, J. D. O'Neil, Samuel C. Lipscomb, Howth & Adams, and F. G. Vaughan,* for appellant.—On question of use of intoxicating liquors and court's failure to charge thereon: Otto v. State, 47 Texas Crim. Rep., 128; Erwin v. State, 10 Texas Crim. App., 701; Kelley v. State, 20 S. W. Rep., 357; Cannon v. State, 56 S. W. Rep., 351; Whitten v. State, 75 Texas Crim. Rep., 227, 170 S. W. Rep., 719; Horhouse v. State, 50 S. W. Rep., 361.

On question of newly discovered evidence: Hill v. State, 53 S. W. Rep., 845; Horhouse v. State, 50 S. W. Rep., 361; Harris v. State, 18

Texas Crim. App., 287; Sabastian v. State, 39 S. W. Rep., 680; Riojas v. State, 36 S. W. Rep., 268; Land v. State, 34 Texas Crim. Rep., 330; Lindley v. State, 11 Texas Crim. App., 283.

On question of clothes of deceased: Melton v. State, 83 S. W. Rep., 822; Cole v. State, 75 S. W. Rep., 527; Milo v. State, 59 Texas Crim. Rep., 196, 127 S. W. Rep., 1025.

*C. C. McDonald,* Assistant Attorney General, for the State.

PRENDERGAST, Presiding Judge.—Appellant was convicted of murder of his wife, and assessed the death penalty.

But a brief statement of the case is necessary. The material facts were proven by uncontroverted testimony of various witnesses.

Appellant was a drinking man and had been for some years. His business was that of a traveling tailor, taking orders for men's ready-made clothing. He became acquainted with his wife while boarding with her parents, and after only a short acquaintance they married about six years before he killed her. After marrying, they left her parents and lived from time to time at first one place and then another. They kept house during their whole married life but a very short time; it seems, because of his traveling, they boarded generally when living together. Because of his cruel treatment of his wife she repeatedly abandoned him and went to and stayed with her parents. She had one child, a little girl, born just nine months after their marriage. She was about five years of age at the time her mother was killed. At one time his wife (deceased) procured a divorce from him, evidently because of his cruel treatment of her. Repeatedly, when she would abandon him because of his treatment of her, he would follow her up and by promises of future good treatment would induce her to return to and live with him for a while. And he repeatedly, after she had procured the divorce from him, besought her to marry him again, and by his promises induced her to remarry him, which she did about the first of October prior to the time he killed her the latter part of the following January. Soon after their remarriage his cruel treatment of her was renewed. It became so unbearable that she again abandoned him and brought a second suit against him for divorce. This was pending at the time he killed her. · After this separation he again sought a reconciliation with her from time to time, and for that purpose, it seems, he repeatedly sought to meet her at various places, and perhaps succeeded in one or two instances, but she persistently refused to again live with him, and she and her little daughter lived with her parents at the time he killed her. Her father at the time was a paralytic, confined to his bed and utterly helpless. The deceased was in the habit of arising early in the morning and preparing an early breakfast for her brother, so that he could early go to his work, and after he would complete his breakfast she would then prepare breakfast for the others. She was killed early one morning.

Her mother, Mrs. W. T. Rigsby, testified that she had more than

one time heard him threaten to kill his wife. She testified: "that he threatened to kill her in October, the first of October, 1914, upstairs in their room. . . . That Mr. Burgess said, 'I could kick you half to death. I would love to kick you to death, and then hang for it. I don't mind being hung. What is death to me? I don't care.' That that was the last time she heard him threaten to take her life before the morning he killed her, because that was the last time that he was in the house."

She further testified: "That her daughter's (deceased's) bedroom adjoins her bedroom on one side, and the dining room just around the corner. That her attention was attracted on the morning of the killing by hearing Mr. Burgess' voice muttering, and her daughter begging him not to kill her. That she could tell that her daughter was in the kitchen, and she said, 'Oh, Mr. Burgess, don't do that; don't shoot me; please don't kill me.' That when she heard that she opened the door leading from that room to the dining room and saw him. . . . That when she opened the door she saw Mr. R. H. Burgess and her daughter. That her daughter was nearer to her, and was just coming from the kitchen to the dining room, backing up, and Burgess was following her. . . . That he had a pistol in his hand and was pointing it at May Burgess (deceased). That when she opened the door she said: 'Oh! my Lord, what is the matter?' and that Burgess replied, 'It's me.' That she saw the first shot, and that her daughter did not have her back to him then but was facing him. That the first shot struck her daughter somewhere in the bowels. That when the first shot was fired May Burgess did not have hold of anything; that when she was shot the first time she begged him after that and kept trying to go to her father's room. That it was about a yard and a half or two yards from the place where she was shot the first time to the place where she was shot the second time, and it was about two steps further to where she was shot the third time. That at the time her daughter received the third shot she had her back to him (appellant) and was trying to get to her father's door, and was right at it. That before she was shot the third time she said: 'Oh! Mr. Burgess, you have killed me; don't shoot me any more. Please don't kill me for my baby's sake.' That Burgess said: 'No, you are not killed. I will kill you,' and laughed, and then shot her again in the back." She further testified that just after shooting his wife appellant left, went out the kitchen door, around the house, out into the street, going away from the scene. That at once after appellant left, her daughter (deceased) said to her: "Oh! mamma, Mr. Burgess has killed me; pray for me; I want you and papa to pray for me": and she said: "Oh! papa, I know you would help me if you could." And she further testified that deceased then told her that the wind was blowing, and she (deceased) closed the door, and she turned to put up her dishes, and he (appellant) opened the door; that she turned around, and he had his hand behind him, and he said: "You won't live with me"; that she said: "I have tried so many times, and you have promised me if I would try you one more time you would

(not) treat me so cruelly, you would not worry me no more, and you promised you would pay for my divorce"; that she said: "Don't do that, Mr. Burgess"; and he commenced pointing a pistol at her, saying the second time: "You won't live with me?" and she said: "No, I can not live with you."

At most, the evidence, without reciting it, barely suggested that appellant, at the time of the killing, possibly might have been insane from the long use of intoxicating liquor, but there was no positive testimony that he was insane from that cause, or any other, at the time he killed his wife. The bare suggestion of insanity might be inferred solely from the fact that he had been a drinking man and a few isolated acts of his conduct occurring long before the killing. However, the court charged in his favor on insanity in a correct charge, telling the jury in effect that, if they believed from the evidence he was insane at the time of the killing, to acquit him, and state in their verdict that they did so on that ground. No exception was taken to the court's charge. Appellant requested one special charge to the effect that, if at the time of committing the offense he had become insane from the long continued and recent use of intoxicating liquor, or from some other cause, to acquit him. We think the court committed no error in refusing this charge in view of the charge of the court. For by the court's charge they were plainly told that, if they believed he was insane to acquit him, which would embrace insanity for any cause whatsoever. No doubt, under the court's charge, if the jury had believed that he was insane from the use of intoxicating liquor or from any other cause, they would unquestionably have acquitted him.

Appellant's next complaint is to the action of the court in permitting the bloody clothes of the deceased to be exhibited before the jury. Dr. Gober was the first witness for the State, and he testified to the location of the wounds upon the body of the deceased, and for that purpose he alone was permitted to adjust deceased's garments to his body so as to show the exact location of the wounds, and the court so states in his qualification of appellant's bill, and further that it was admitted for that purpose. There is no intimation in the bill, or otherwise in the record herein, that the bloody garments were made use of by the State in any argument to the jury whatever, or otherwise than the mere fact, as stated by the court, of identifying thereby the wounds inflicted by appellant upon the deceased. Even the doctors themselves differed as to whether some of the wounds entered from the front or rear of the body. From the State's viewpoint the clothes were admissible, and we think, under the authorities, no error is presented on this question that would authorize this court to reverse the case. Branch's Crim. Law, sec. 436.

In his next bill he claims the court erred in admitting the dying declaration of the deceased on two grounds: (1) because it was not signed, nor did it purport to be signed, by the deceased; (2) that it was not voluntary but made in response to solicitations propounded to her. We have carefully considered the evidence on this point, and, in

our opinion, the proof is clear, forcible and amply sufficient under the statute (art. 808, C. C. P.) to not only authorize, but to require the admission of said statement in evidence. See Judge White's sections under said statute for a collation of some of the authorities. The judge in his qualification to this bill states that the witness Synnott testified: "The deceased was in a weakened condition, and that he signed her name to the written statement, and she touched the pen. The written statement, which is a part of the record, speaks for itself." This statement is nowhere in the record—either bill or statement of facts. The testimony of Synnott shows that he read the written statement over to the deceased twice, and that in effect she said it was correct, and he says that she was too weak, he thought, and in a dying condition, so that she was unable to write her whole name, and that he had her to touch the pen while he wrote it. His testimony and that of all the other witnesses on the subject, without question, we think, disproves the other ground of the bill.

The only other question is, appellant claims he was entitled to a new trial because of newly discovered testimony, and he attaches the affidavit of some persons, which he claims is sufficient to show that.

The record shows that he killed deceased on January 27, 1915, and was arrested therefor immediately afterwards. The grand jury indicted him February 12, 1915. The case was not tried until May 1st thereafter. The record shows that one of his brothers attended the trial as a witness but did not testify. One affidavit of claimed newly discovered evidence is that of Woods Anderson, which is solely to the effect that he had known appellant for four years while he resided in Clifton and Hico, Texas, and that, while he resided in those places, he was addicted to the excessive use of intoxicating liquor. This certainly could not be claimed to be newly discovered evidence. If true, appellant unquestionably knew it. Besides, the evidence as a whole shows that he was a drinking man, and that he got on sprees. The next affidavit is that of Dean Hunt. The record shows that Dean Hunt was a witness on this trial and testified therein. His affidavit of claimed newly discovered evidence is solely to the effect that on each occasion when he saw appellant take some kind of drugs that it was in the form of a little white powder, and immediately after taking it he would fall asleep in his chair, and on one occasion fell asleep on a table in the shop where he was working. That he did not know the name of the drug, but reaches his conclusion that it was a strong narcotic from its appearance and its immediate effect. His sole testimony on the trial on this point was that about a year before the homicide when talking to appellant one day appellant turned away from him, poured some white powder in his hand and took it. He did not know what the powder was. He did not describe what effect it had, nor did he tell anything else that he now claims to disclose in his affidavit. We can not see how it is possible, if any or all of this is true, that appellant did not know it at and before his trial, and that Dean knew this, and that Dean knew what he swore in this affidavit before and at the time he testified. He

had several witnesses from the location fixed by Dean to testify in his behalf, and none of them detailed any such character of statement as Hunt now for the first time discloses in his affidavit. The next affidavit is that of Dr. Harlan, a resident of Beaumont, where this killing and trial occurred, and his affidavit merely states that, in his opinion, the excessive use of intoxicating liquors, combined with the habitual use of narcotic drugs, will, and in many instances it has, produced such a degree of insanity to prevent the user from knowing and understanding the nature of his acts. This could not be newly discovered evidence. Perhaps any other physician would have testified to the same thing as an expert. The appellant's attorneys who tried the case below also attached their affidavits, wherein they state in effect that they used diligence to ascertain the appellant's mental condition, but they nowhere state what that diligence was or what diligence they used other than their mere conclusion. The only other affidavit is that which purports to be the affidavit of Frank Fenwick Young, a Louisiana doctor. The effect of his affidavit is that about ten years before this homicide the appellant was in his sanitarium in Louisiana for treatment for inebriety, and that he treated him and soon after discharged him, much better, but, he thinks, not entirely cured, and he gives his opinion from what has been told him about the killing and appellant's condition at the time, without stating what that is, that he was of the opinion that he was insane at the time of the killing. Surely, this can not be claimed to be newly discovered testimony. If appellant had ever been treated by this doctor for inebriety and discharged as much better, he certainly knew it. In our opinion, appellant's motion on the ground of newly discovered evidence is wholly without merit and did not authorize the lower court to grant a rehearing thereon nor this court in reversing because thereof. Besides, the judgment of the court overruling his motion shows that the court after hearing it and the evidence thereon overruled it. What that evidence is which the court heard is in no way disclosed to this court.

The judgment is affirmed.

*Affirmed.*

### ON REHEARING.

#### January 12, 1916.

PRENDERGAST, PRESIDING JUDGE.—After the original opinion affirming this case had been handed down, in connection with his motion for rehearing, appellant also by certiorari had brought up proper copies of some papers which had been omitted in the original transcript. All these, in connection with the whole record, have been duly considered by us.

Nothing new, so far as the merits of this case are concerned, are urged on this rehearing. He merely presents and urges some of the same things that were presented on the submission of the case originally.

Deceased's mother, Mrs. W. T. Rigsby, and appellant were the only

eyewitnesses to the murder. He did not testify. Mrs. Rigsby did. He sought in his cross-examination of her to impeach her by showing that she was addicted to the use of morphine and that, therefore, her testimony against him was unreliable and perhaps not true, especially as to the position the deceased was in when appellant shot her the three times. As stated in the original opinion, the State's witnesses, the doctors who testified to the wounds in the body of the deceased, differed as to the exit and entrance of the bullet holes in her body. In this connection it was proper, if not necessary, that the garments worn by the deceased at the time appellant killed her, be exhibited to determine therefrom whether some of the wounds were the exits or entrances of the bullets in her body. And in this respect no error was shown by the exhibition of said garments. As stated in the original opinion, the record shows that no improper use or argument was made of these clothes. They were simply exhibited so that the witnesses could point out, as they did, where the balls had entered the body of the deceased, as shown by the garments themselves. This is so well established as the law in such matters that we deem it unnecessary to cite or discuss the authorities.

Appellant, again, by his able attorneys, contends that the court erred in refusing to give his special charge to the effect that, if the jury "find from the evidence that the defendant at the time of committing the offense had become insane from the long continued and recent use of intoxicating liquors, or from some other cause," to acquit him; and that it was reversible error not to give it. He also contends, in effect, that the evidence was sufficient to show that at the time he killed deceased he was insane, caused by the long continued use of intoxicating liquors to such an extent as to at that time show that he was suffering from delirium tremens. And, further, that, because of his then said insanity, he could not be held to diligence in securing witnesses to show his then insanity. His attorneys make a plausible argument along this line, but it is wholly fallacious in that it assumes facts for its basis, which the record does not bear out. The mere fact that one accused of crime *pleads* insanity as a defense is no evidence that he was insane at the time of the commission of the act. The pleading is the mere basis for the introduction of evidence and not evidence.

Because of appellant's insistence and the fact that the death penalty in this case was inflicted, we have again read and studied the evidence and record in this case carefully, and we are more confirmed than ever that no reversible error was committed on the trial of this case that would authorize or justify this court in any event to reverse this case. Upon a further study of the evidence we are satisfied that there is no testimony that appellant was insane from delirium tremens, or and other cause, at the time he killed the deceased, but, on the contrary, that he was then sane. There is no evidence in this regard whatever that appellant ever at any time or at any place had delirium tremens. At most, the evidence would tend to show that for a number of years prior to the killing appellant was a drinking man and occasionally in

previous years got on sprees, but the evidence from his own witnesses shows that he had quit drinking for some time before this offense was committed, and there is no evidence whatever to show that at or about the time of this killing was he either drunk or drinking. The evidence as a whole, without doubt, and without contradiction, shows that for at least six years prior to the killing appellant had lived in, and the territory around Beaumont. That his wife's parents for about four years before the killing had lived in Beaumont, and that most of that time their daughter had been with them in their home, separated from appellant repeatedly because of his cruel treatment of her. There is no evidence that indicates that he was not competent to attend to his business day in and day out for all these years. On the contrary, as a matter of fact, it shows that he was in the active pursuit of his business during all these years.

"Every person is presumed to be of sane mind until the contrary is shown. Carter v. State, 12 Texas, 500, 62 Am. Dec., 539; Fisher v. State, 30 Texas Crim. App., 502, 18 S. W. Rep., 90 (following Webb v. State, 5 Texas Crim. App., 596; s. c., 9 Texas Crim. App., 490); King v. State, 9 Texas Crim. App., 515; Massengale v. State, 24 Texas Crim. App., 181, 6 S. W. Rep., 35; Guerrero v. State (Crim. App.), 171 S. W. Rep., 731." Note 1, art. 40, Vernon's Ann. P. C.

"Accused has the burden of proving insanity by a preponderance of evidence. Roberts v. State, 67 Texas Crim. Rep., 580, 150 S. W. Rep., 627; Carter v. State, 12 Texas, 500, 62 Am. Dec., 539; Leache v. State, 22 Texas Crim. App., 279, 3 S. W. Rep., 539, 58 Am. Rep., 638; Hurst v. State, 40 Texas Crim. Rep., 378, 46 S. W. Rep., 635, 50 S. W. Rep., 719; Boren v. State, 32 Texas Crim. Rep., 637, 25 S. W. Rep., 775; Webb v. State, 5 Texas Crim. App., 596; s. c., 9 Texas Crim. App., 490; King v. State, id., 515; Johnson v. State, 10 Texas Crim. App., 571; Jones v. State, 13 Texas Crim. App., 1; King v. State, id., 277; Mendiola v. State, 18 Texas Crim. App., 462; Smith v. State, 19 Texas Crim. App., 95; Fisher v. State, 30 Texas Crim. App., 502, 18 S. W. Rep., 90; Lovegrove v. State, 31 Texas Crim. App., 491, 21 S. W. Rep., 191; Stanfield v. State, 50 Texas Crim. Rep., 69, 94 S. W. Rep., 1057; McCullogh v. State, 50 Texas Crim. Rep., 132, 94 S. W. Rep., 1056; Fults v. State, 50 Texas Crim. Rep., 502, 98 S. W. Rep., 1057; Kirby v. State (Crim. App.), 150 S. W. Rep., 455; Welch v. State, 71 Texas Crim. Rep., 17, 157 S. W. Rep., 946; Douglas v. State, 73 Texas Crim. Rep., 385, 165 S. W. Rep., 933; Guerrero v. State (Crim. App.), 171 S. W. Rep., 731." Note 2, art. 40, Vernon's Ann. P. C.

Appellant killed his wife early in the morning. He was very soon thereafter arrested and has been confined in jail continuously ever since. Some five doctors living in Beaumont testified in the case. He did not attempt to prove by any or either of them, and none of them testified, that he was insane at or about the time he killed his wife. At most, by one of them, Dr. Johnson, he attempted to prove that at a time months before the killing he acted queer towards Dr. Johnson, and that Dr. Johnson at the time was afraid of him because, as Dr.

Johnson said, appellant was then drinking and had seen his wife go into Dr. Johnson's office and must have seen her go out, and, because of some jealousy of her, he at once went into Dr. Johnson's office and so acted because of his jealousy and being drinking at the time as to cause Dr. Johnson to then think he was "not exactly normal at the time." There can be no doubt from the evidence that he was in Beaumont time and again and frequently for some time prior to the killing. He was doubtless known by a large number of people living there at the time. The officials who had him in charge and who arrested him immediately after the act, and none of them, testified on the subject. No expert at any time examined him for the purpose of ascertaining whether he was sane or insane, doubtless because he knew he was not insane, and his attorneys must have known it.

Under the very terms of our statute and all the decisions thereunder (art. 41, Vernon's Ann. P. C., and decisions noted thereunder) neither intoxication nor temporary insanity produced by the voluntary recent use of ardent spirits shall constitute any excuse for the commission of crime, nor shall intoxication mitigate the crime or the penalty of crime. In this case there was no evidence to show, and none tending to show, that appellant was drunk, or even drinking, at the time he killed his wife, nor at any time recently theretofore.

The court gave a full and proper charge in appellant's favor submitting the question of his insanity to the jury for a finding. His charge was in accordance with the many decisions of this court. A large number of them are collated under article 40, Vernon's Ann. P. C. It is unnecessary to give them in this opinion. Doubtless, the court thought it better to submit the question of insanity to the jury under an abundance of precaution, even though the evidence did not call for such a charge. It was in his behalf and not against him. Christian v. State, 71 Texas Crim. Rep., 566, and authorities there cited.

We think it unnecessary to further discuss any question in this case. From a full and thorough consideration of the record, the law applicable to the question, appellant's brief and authorities cited by him, we are fully satisfied that no reversible error was committed in the trial of this cause, and under the law we can not do otherwise than overrule his motion for a rehearing, which is accordingly ordered.

*Overruled.*