## Sam Ross v. The State.

No. 780.  Decided November 23, 1910.

Rehearing Denied December 21, 1910.

**1.—Assault with Intent to Rape—Continuance—General Reputation—Illicit Act.**

Upon trial of assault with intent to rape there was no error in overruling defendant's motion for continuance to show that the absent witness had been in company with the prosecutrix at different times prior to the date of the alleged offense, and that she had submitted to sexual intercourse with said witness, and that defendant had been so informed. Following Wilson v. State, 17 Texas Crim. App., 525.

**2.—Same—Rule Stated—General Reputation—Want of Chastity.**

The rule makes general reputation and illicit acts with the accused alone admissible as evidence of want of chastity; and acts of illicit intercourse with parties other than the accused are inadmissible. Following Pefferling v. State, 40 Texas, 487.

**3.—Same—Evidence—General Reputation—Chastity—Consent.**

Where upon trial of assault with intent to rape, the evidence showed, that at the time the alleged assault was made upon prosecutrix by defendant and others, there was nothing to indicate that the parties believed that they could secure her consent for sexual intercourse, there was no error in not admitting in evidence testimony as to the general reputation of the prosecutrix for virtue and chastity; besides such testimony could not have changed the result of the trial. Following Wilson v. State, 17 Texas Crim. App., 525.

**4.—Same—Charge of Court—Principals—Evidence—Conspiracy.**

Where, upon trial of assault with intent to rape, testimony was admitted with reference to a conversation had in the absence of defendant as to the whereabouts of defendant and his companions, and that they were at a place anticipated by prosecutrix and others with whom she had such conversation, there was no error in the court's failure to charge that such declarations could not be received unless a conspiracy was shown; it developing that the defendant and his said companions were found at said place only a few minutes after this conversation occurred, and thereupon assaulted prosecutrix; and the conversation not relating to the offense.

**5.—Same—Evidence—Declarations of Third Party—Outcry.**

Where upon trial of assault with intent to rape, the court permitted the State to prove a conversation had between a third party and the prosecutrix, as they were leaving the scene of the alleged assault, in which the prosecutrix was told not to tell her father of the conduct of the defendant and his companions as it might result in her father's death, there was no error; in view of the attempt of the defense to discredit prosecutrix's testimony because she did not make an outcry immediately after the offense.

**6.—Same—Charge of Court—Principals—Conspiracy.**

Where upon trial of assault with intent to rape, the evidence showed that the defendant, with others, engaged in the assault upon prosecutrix and was a principal actor therein, there was no error in the court's failure to charge the jury that if there was no agreement between the parties or a conspiracy entered into by them before the alleged assault, that the defendant was not a principal; and the court did not err in submitting the law of principals without charging on the law of conspiracy.

**7.—Same—Sufficiency of the Evidence—Conspiracy—Charge of Court.**

Where, upon trial of assault with intent to rape, the defense relied upon

was that the defendant had no purpose to assault the prosecutrix, but simply demanded an explanation of her as to a letter she had written about defendant and others, but the evidence showed that the defendant and others assaulted prosecutrix at midnight in a secluded place when she was returning with her escort from a social gathering, the verdict of guilty was fully warranted; and there was no error in the court's failure to charge on conspiracy.

### 8.—Same—Specific Intent to Rape—Abandonment.

Where, upon trial of assault with intent to rape, the evidence showed that the defendant and others assaulted the prosecutrix for the purpose of having carnal intercouse with her at all hazards, the specific intent to rape is established, and it is no defense that subsequently thereto the defendant abandoned his design.

Appeal from the District Court of Comanche. Tried below before the Hon. J. H. Arnold.

Appeal from a conviction of assault with intent to rape; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*G. E. Smith* and *L. V. Reid,* for appellant.—Upon question of admitting evidence as to a conversation between prosecutrix and others as to the whereabouts of defendant and his companions: Parker v. State, 13 Texas Crim. App., 213; Burke v. State, 15 Texas Crim. App., 166; Roquemore v. State, 50 Texas Crim. Rep., 542, 99 S. W. Rep., 547; Holloway v. State, 54 Texas Crim. Rep., 465, 113 S. W. Rep., 928; O'Quinn v. State, 55 Texas Crim. Rep., 18, 115 S. W. Rep., 39; Arnold v. State, 9 Texas Crim. App., 435; Blain v. State, 33 Texas Crim. Rep., 236.

Upon question of admitting conversation of prosecutrix and her escort after alleged offense: Williams v. State, 40 Texas Crim. Rep., 565; Nix v. State, 45 Texas Crim. Rep., 504, 74 S. W. Rep., 764.

On question of general reputation for chastity and acts of illicit intercourse with persons other than accused: Shields v. State, 32 Texas Crim. Rep., 498; Freeman v. State, 52 Texas Crim. Rep., 500; Crow v. State, 48 Texas Crim. Rep., 419; Spencer v. State, 59 Texas Crim. Rep., 217, 128 S. W. Rep., 118; Horbach v. State, 43 Texas, 432, and cases cited in opinion.

Upon question that after cross-examination the party calling witness has right to reexamine: Favors v. State, 20 Texas Crim. App., 155; Brundige v. State, 49 Texas Crim. Rep., 596, 95 S. W. Rep., 527; Jackson v. M., K. & T. Ry., 55 S. W. Rep., 376.

On the court's failure to charge on defendant's theory of defense: Caddell v. State, 44 Texas Crim. Rep., 213, 70 S. W. Rep., 91; Freeman v. State, 52 Texas Crim. Rep., 500, 107 S. W. Rep., 1128.

Upon question of court's charge on principals and failure to charge on conspiracy: Walker v. State, 29 Texas Crim. App., 621.

Upon question of declarations made by third parties in the absence of the defendant: Loggins v. State, 8 Texas Crim. App., 434; id., 12 Texas Crim. App., 65; Felder v. State, 6 S. W. Rep., 145; Crook

v. State, 27 Texas Crim. Rep., 198, 11 S. W. Rep., 444; Hudson
v. State, 43 Texas Crim. Rep., 420, 66 S. W. Rep., 668; Chapman
v. State, 45 Texas Crim. Rep., 479, 76 S. W. Rep., 477.

Upon question of force used by the defendant: Caddell v. State,
44 Texas Crim. Rep., 213, 70 S. W. Rep., 91; Freeman v. State, 52
Texas Crim. Rep., 500, 107 S. W. Rep., 1128.

Upon question of want of specific intent to rape: Caddell v. State,
44 Texas Crim. Rep., 213, 70 S. W. Rep., 92; Warren v. State, 51
Texas Crim. Rep., 598, 103 S. W. Rep., 888; Cromeans v. State, 59
Texas Crim. Rep., 611, 129 S. W. Rep., 1129; Smith v. State, 56
Texas Crim. Rep., 316, 120 S. W. Rep., 191; Thompson v. State, 43
Texas, 584; Rhea v. State, 30 Texas Crim. Rep., 483, 17 S. W. Rep.,
931; Toppolanck v. State, 40 Texas, 160; Price v. State, 36 Texas
Crim. Rep., 143, 35 S. W. Rep., 988; Curry v. State, 4 Texas Crim.
App., 574; House v. State, 9 Texas Crim. App., 567.

*John A. Mobley,* Assistant Attorney-General, for the State.

McCORD, Judge.—This is an appeal from a conviction for assault
with intent to rape, appellant's punishment being assessed at two
years confinement in the penitentiary.

At the April term, 1910, of the District Court of Comanche County
a bill of indictment was returned against Sam Ross, charging him
with an assault to rape upon Meda McDonald, a woman. He was
brought to trial at the same term of the court, which resulted in
his conviction.

A brief summary of the statement of facts discloses the following:
The prosecutrix lived in the country, about one mile and a half north-
east of Sydney, a village in Comanche County, with her parents. She
was a young lady about eighteen years of age. On the evening of
the 18th day of February, 1910, appellant came to the house of
prosecutrix' father in a buggy for the purpose of accompanying her
to a party at the home of one Bud Arnold. He was driving Ed
Nowlin's buggy. She declined to go with him on the ground that
her parents objected to her keeping company with him. Appellant
stated that he was aware of that fact, but that he was requested by
Ed Nowlin to bring her to the party. Prosecutrix had an engage-
ment with Nowlin to carry her to the party. Appellant in-
formed her that Nowlin could not come for her on account of being
engaged in making the necessary preparations for the party, and
had requested him to come and bring her, and that he, Nowlin,
would take her back home. She finally consented and did accompany
him to the party, leaving home about night. The party was some
two and a half or three miles from her home. Nothing transpired
on the trip to the party other than that after they passed the Sydney
village the defendant turned his horse to go in a different direction

than that of Arnolds, when she said, "This is not the way to Ar-
nolds." Appellant replied, "Of course, I will take you to the
party." About an hour after they reached Arnolds she discovered
the defendant was drinking. Defendant approached her and said,
"If I ring one what will I get?" The witness replied she did not
know. Defendant then said, "If I ring two what will I get?" Wit-
ness replied that she did not know, and told him to ask Bud, as the
switchboard was there at his house. He said, "If I ring three what
will I get?" She replied she did not know. He then replied, "You
think I am talking about that old switchboard, don't you?" The
prosecutrix replied that she did, when defendant replied, "Well, I
am not." She then requested defendant to leave her and let her
alone. When the party broke up the defendant approached her and
asked her if she was going to go back with him. The witness told
him she was not, as she was not in the habit of going around with
drunken boys. Ed Nowlin then approached the prosecutrix and
asked her if she was going back with him. She replied she was, and
that Ed then took her to the buggy and they started off. That when
they got about half way from Arnolds to Sydney they passed some
parties, and one of the parties, Eva Kelley, spoke up and said, "Look
out for those boys." The prosecutrix then speaking to Nowlin, said,
"What if those boys have gone on down the road?" when Nowlin
spoke up and said, "If they have gone on down there they have gone
after some whisky. You know that creek down there is a popular
place for boys to get whisky. If we do run across anybody down
there the best thing you can do is to be quiet and we will pass them."
They continued on their journey towards her father's home, and
when they got beyond Mr. Wells' house and opposite a gate that
went into a pasture, the defendant Sam Ross ran out and jerked the
lines out of Nowlin's hands and commenced jerking the horse. The
horse ran backwards. He then started to pulling the horse towards
the gate. About that time Aaron White ran up and commenced
trying to get in the buggy when the witness struck him. White
struck her back. Appellant then commenced leading the horse
towards the gate of the pasture, and Deb Stewart then opened the
gate, and said, "Bring them on, boys." All the time White was try-
ing to get in the buggy. That Nowlin told White to go away and
let them alone; and told Sam Ross to go away, that he did not know
what he was doing, that he was drunk. They carried the buggy on
down into the pasture about one hundred yards. All the time
White was struggling to get into the buggy, and the witness prose-
cutrix says that he succeeded in getting in the buggy before it
stopped. The first thing that she recollects of White saying was,
"You will call Sam Ross and myself damn pikers, will you?" Wit-
ness replied she had not done so. White replied, "You did in that
letter." She again denied it. Then White spoke up and said, "Meda
Mc, you damn bitch, I will have intercourse with you or I will die."

And the defendant, Sam Ross, spoke up and said, "Hell, yes, that is what we are here for. You had better get out of that buggy, and that damn quick." About this time the buggy stopped. Ed Nowlin then got out of the buggy when White pushed her over on the right side of the buggy and got in the buggy. She said Ed Nowlin got out on the other side of the buggy, and was talking to the boys, and knocked Sam Ross down some time during the time, but picked him up; that he was talking to them and trying to get them to go away, and said, "If I had anything to do it with I would kill every damn one of you." White was telling the witness to get ready and get out of the buggy, stating to her, "Meda, I don't want to force you, but I am going to have it this time." Stewart then said, "Yes, and I am, too; it has been a long time since I have been over to Chandlers." Aaron White then spoke up and said, "Oh, yes, you call us damn pikers." Prosecutrix continuing said: "Sam Ross called me things that I never heard of before, and Deb Stewart said that he was from San Antonio, and that he could show me things that I never heard of or dreamed of. All three of them asked me what I thought I could do with three boys like them, and I told them I did not know. Aaron White was fighting me part of the time while he was in the buggy with his fist. He threw his leg, or attempted to throw his leg, across my lap and I knocked it off, and he did that two or three times, and I knocked it off every time. I do not know where his hands were all the time he was doing that. He caught me by the shoulders and jerked me around and told me to get out of there. He hit me in the face and everywhere that he could. He hit me with his fist and hit me in the eye and made it black. My eye stayed black as a result of that lick or those licks for something over a week. My eye swelled until it was about half closed. While Aaron White had me by the shoulders and was trying to throw his leg across my lap, I was fighting him all the time. That is all I could do. I was fighting him with my hand a part of the time and with the buggy whip a part of the time. I got out of the buggy just as quick as I could. When Aaron got so rough with me Deb Stewart turned to Ed Nowlin and said: 'We are not treating her like a lady,' and said, 'I am with you now,' and Deb took Aaron or Sam Ross one, and Ed took the other one, and while they were doing that I got a chance and jumped out of the buggy and started home afoot, and Sam said to Aaron, or Aaron said to Sam, I don't know which, 'Will we let her go?' and the other one said, 'I reckon so, I don't know what else to do,' and Sam said, 'If she goes she will damn sure walk,' and I said, 'I can do that,' and Ed Nowlin came and we started home and got about half way from the buggy to the gate when Sam Ross, the defendant, come up on us and remarked: 'You are not going home,' and he caught me by this shoulder and jerked me around and I told him I was going home and he struck me. He struck me on the left breast

the first time, and then he hit me about twice in the face, and hit me in all more than a half dozen licks. He told me that I was not going home until I did as they said to do. I do not know just exactly the words that they did use, but they gave me to understand that I was not going home till I submitted to their wishes. Then Aaron White came up and he caught me by both shoulders and jerked me around. I think it was Deb who stopped Sam Ross from fighting me, because Ed was down there with Aaron White, and Aaron came down there and told me that I was not going home, and I told him that I was, and he struck me and grabbed me by the shoulders, and Ed said, 'You can't do any girl that I am with that way,' and I said, 'No, I have a father who will protect me if Ed can't do anything,' and Aaron White said, 'Your daddy is a son-of a bitch.' White then grabbed me by both shoulders just like he did while we were in the buggy and was fighting me all the time. He tore the strap off of my corset cover and tore it about half way around. Deb then came up and got Aaron to stop fighting me and then went back and got the buggy and we got in the buggy and Sam and Aaron says: 'Are you going to tell your papa?' and I told them I certainly was, and Sam says, 'Tell him I am the same old Sammy,' and Aaron says, 'Tell him my name is White,' and we got in the buggy and went on home." Continuing she said: "I remember very distinctly the exact words that Aaron White used when he was try-ing to get in the buggy with me and said, 'Meda Mc, you damn bitch, I will have intercourse with you or die.' Intercourse is not the word that he used, but it was a word that I would not like to say at all. It was a much worse word than intercourse." She said that all the time she was fighting White and Ross she was crying. Continuing she said: "While White had hold of me in the buggy and was fight-ing me Deb Stewart came around and put his hand on my knee and tried to put his hand under my clothing, and I told him to take his hand off of me or I would hit him, and he did take it off." She states further that they had her down there about thirty minutes. Continuing she said: "Sam Ross came up to the buggy and laughed and asked me how long it was going to take me to get out of that buggy and get busy." She said that while White was in the buggy with her and fighting her and trying to put his leg over her lap, Ross went off and then returned in two or three minutes, "and he cursed awfully. He said words that I never did think of. I do not know what all he called me. He called me a lying devil and a damn bitch, and I don't know what all he did say. He told me what they were aiming to do with me. When Aaron White said that he was going to have intercourse with me or die, Sam Ross said, 'Hell, yes, that is what we are here for, and you had better be getting out of that buggy, and that damn quick.'" The witness further tes-tified that she had never gone with Sam Ross before that night. She had been at parties where he was, and had seen him out in company.

That Aaron White had gone with her some before that, and that she had written a letter to Aaron White on Monday or Tuesday before this Friday night, in which she informed him that she would not go with him any more and from that time on they would be strangers. Witness continuing said that after she and Nowlin left the place, in the buggy, Nowlin asked her if she was going to tell her father, when she replied she was. Nowlin then said, "I would not now anyway. You know your father will get something, he said a gun, and attempt to kill them, and they will be prepared for him and be looking for him and he will get killed," and "I told him that I was going to tell him and he persuaded me not to do it." She said she finally promised Nowlin that she would not tell now on them, because she was afraid her father might get killed. She admitted upon the witness stand that when her mother asked her about her eye being black the next morning she told her that a cow had hooked her in the eye while she was milking. She admits that she told a great many stories as to how she got the black eye, and that she did not tell anyone about the matter until some week or ten days thereafter, when she told her schoolmate about it, and she gave as a reason why she told so many stories about how she got this injury to her eye, was because she was afraid that her father might be killed, and that was her whole purpose in not divulging the matter. The witness says that she screamed once or twice. That they carried her down in a pasture on a little branch. This branch was skirted with a good deal of timber and brush and the only wooded place around there. The night was a moonlight night. The pasture gate opened about 150 yards north of the house of a man named Wells. The wind was blowing from the south. The witness Cox testified that he was fixing to unhitch his horse at Wells' gate, making preparations to retire; that he saw somebody up at the gate; that he did not know any of the parties, but that he saw somebody leading a horse in at the gate; that the horse was hitched to a buggy, and parties were in the buggy. The buggy had a top to it, and he could not see on the opposite side. However, he said he heard no noise, and that he was about 150 yards from the parties, but that the wind was blowing in the direction of the buggy. It appears that neither the defendant nor the parties with him lived near the place of the assault, and that this was not on the road to their home from the party where they had been. They lived in an entirely different direction; they had no business at the place at that time of night. This assault was committed about midnight, and the young lady and her companion and escort were carried from the road into a pasture and down on a creek, which creek was skirted with heavy timber, and was the only place anywhere along or near this road where there was any timber. We have not attempted to set out all the facts connected with the case, but a sufficient portion of same to throw light upon the issues that will be discussed in this opinion.

1. When the case was called for trial the defendant made an application for a continuance in order to secure the testimony of one Charles Stewart, whom defendant alleged resided in Kendall County, by whom he expected to prove that he had been in company with the prosecutrix at different times prior to the date of the alleged offense, and that she had submitted to sexual intercourse with said witness, and that defendant had been so informed. This motion was overruled, and appellant took a bill of exceptions. Was this testimony admissible? We are of opinion that it was not. In the case of Wilson v. State, 17 Texas Crim. App., 525, this court, speaking through Judge White, said: "In prosecutions for rape it is unquestionably competent for the accused to impeach the character of the prosecutrix for chastity—not, indeed, to justify or excuse the offense, but to raise a presumption that she yielded her consent and was not in fact forced. But the rule seems to be limited to general reputation for chastity and to acts of illicit intercourse with the accused alone, whilst specific acts with other parties than the accused are not competent and admissible as evidence." It is true that in some jurisdictions a step beyond this general rule has been taken, and acts of illicit intercourse with parties other than the accused have been admitted. But as stated by Judge White, in the Wilson case, supra: "However reasonable this latter rule may appear, with us the doctrine is too well established and understood otherwise, as stated above, to be now extended or interfered with. That rule makes general reputation and illicit acts with the accused alone admissible as evidence of want of chastity. Pefferling v. State, 40 Texas, 487." Therefore, following the long and well established rule in this State, this testimony was not admissible, and, therefore, the court correctly refused to grant the continuance.

2. In the trial of the case appellant offered several witnesses to prove the general reputation of the prosecutrix for virtue and chastity. This testimony was excluded by the court, and a bill of exceptions reserved, the bill stating that if permitted to ask the question the witnesses would have answered that her reputation for virtue and chastity was bad. This presents a serious question and one not free from difficulty. Generally in cases of rape and assault to rape, it is held competent evidence to prove that the reputation of the prosecutrix for chastity is bad, not as an excuse for the offense or justification for the same, but as raising the presumption that she may have yielded her consent and was not in fact forced. Now, two questions are presented in this case, to our minds, first, conceding that the court was in error in ruling out this testimony, could it probably have had any bearing upon the case, in view of the evidence disclosed in this record? Could it have had any appreciable effect upon the result of the trial? Second, from the character of the testimony offered by the State (and there was no testimony offered on the part of the defendant to contradict the statements of the

prosecutrix as to what transpired on this occasion) was the issue of the prosecutrix' chastity involved in the case? In the Wilson case, 17 Texas Crim. App., 525, supra, Judge White says: "Rape may be committed upon the most notorious prostitute, and if the physical facts and personal violence are proven, it were worse than idle to rebut them simply· by proof of want of chastity." How could this proof throw any light upon the issues involved? There is not a circumstance in the record, yea, not a shadow of suspicion that there had been anything transpiring between the defendant Ross and prosecutrix, or White and prosecutrix, or Stewart or Nowlin and the prosecutrix, that would lead any one of them to suspect that the prosecutrix would consent to a thing of this sort. No indiscretions of the prosecutrix were offered in testimony. She had never been in company with Ross before this night. She had on the Monday previous informed White by letter that she would from that time on cease to accompany him anywhere, and that they would be strangers. Nothing at the time of the assault made upon prosecutrix would indicate that the parties believed that they could secure her consent to their diabolical propositions. When the reason for a rule ceases to exist the rule itself ought to cease. If the surroundings and physical facts of the assault or the conduct of the parties previous thereto were of such a character as that the question of consent is suggested, then in this character of case proof of general reputation for chastity would be admissible. But when every fact, when the conduct of the parties is before the jury, and everything excludes the idea of consent, it would be idle to attempt to rebut them simply by proof of a want of chastity. Such testimony could only become material where there is some question as to the consent of the prosecutrix. There is not a fact or circumstance to indicate the appellant and his codefendants believed or had the right to believe the prosecutrix would consent. In this case the evidence excludes the idea, as there is no question as to the force used and the want of consent. See Steinke v. State, 33 Texas Crim. Rep., 65. We therefore hold, first, that as the facts and circumstances do not show or suggest consent on the part of the prosecutrix, the testimony could not have changed the result of the trial; and, second, that it was not material to any issue developed by the testimony. It is not the admission of illegal evidence or rejection of legal testimony that will work a reversal. · The record must disclose not only that the action of the court below was error in excluding or in admitting the testimony, but the record must be˜ considered to determine whether such action of the court below could possibly have harmed the injured party, and whether the action of the court brought about a result that would have been otherwise had the testimony been admitted. We are, therefore, of opinion that in this character of cases, under the proof as developed, that the testimony was not admissible, and if admissible, would have

had no bearing upon the case and could not rebut or overcome the testimony of the prosecutrix.

3.   Complaint is also made that the court should have charged the jury fully upon the law of principals and accomplices, and that the charge of the court on the subject of principals· was not full enough, and that the court should have directed the jury that before the acts and declarations of third parties could be considered against appellant the State must first establish a conspiracy, and if there is a failure to prove a conspiracy, on the part of the State, that the jury would not consider the acts and declarations of third parties before the commission of the offense.   There were no declarations made by other parties in regard to this offense that were of an inculpatory character and introduced against appellant.   Only two instances of declarations outside of the presence of the defendant were introduced on the part of the State.   One was with reference to what the Kelley girl said to Nowlin and the prosecutrix as they were passing in the buggy before they reached the pasture, when the Kelley girl said:   "Watch out, those boys have gone ahead."   And what prosecutrix said to Nowlin about what their conduct should be if they met the boys up there, and as to Nowlin's statement that if they had gone up there they had gone to get whisky.   There was nothing of an inculpatory character in this conversation.   It was simply the statement of a fact that some boys had gone ahead.   But when it is shown that the boys were at this place, and were found there only a few minutes after this conversation occurred, it would render this declaration harmless, and the introduction of the same could not possibly have injured appellant, nor was the court called upon to limit the effect of the declarations.   We are of opinion that the testimony was admissible, taking the same in connection with the fact that the parties were found at the place where Nowlin anticipated they would be, and that the court was not called upon to charge the law with regard to receiving and considering declarations made by third parties in the absence of the defendant, and to reject same if a conspiracy was not proven.

4.   The next bill of exceptions is to the action of the court in permitting the State to prove the conversation had between Nowlin and the prosecutrix when he was carrying her home from the scene as to Nowlin persuading her not to tell her father.   Appellant was attempting to discredit the witness by showing that she did not make an outcry immediately after the offense was committed, and, second, the contradictory statements she made as to how she received the black eye.   The witness was giving a reason why she had made these statements and why she had not disclosed to her father the conduct of these parties.   She had been advised by Nowlin that it might result in the death of her father; that he was an old man, and that these defendants would have every advantage of him, and she said it was by reason of the fact that she feared injury to her father that she

remained silent so long and made contradictory statements. We think this testimony was admissible. It was not a declaration with regard to the crime committed. It was not a disclosure made by Nowlin as to why the parties went there or the purpose in going there. It was simply a conversation as to whether publicity should be given to this matter, and same was harmless in its character.

5. Complaint is also made of the court's charge on the subject of principals. The court instructed the jury that all persons were principals who were guilty of acting together in the commission of an offense, and that when an offense had been actually committed by one or more persons, that the true criterion in determining their guilt was, did the parties act together in the commission of the offense; was the act done in pursuance of a common intent and in pursuance of a previously formed design in which the minds of all united and concurred, and if so, then the law is that all are alike guilty, provided the offense was actually committed during the existence and in the execution of the common design and intent of all. The court then directed the jury that if they should believe beyond a reasonable doubt that Sam Ross acting alone or acting together with Deb Stewart, Aaron White and Eddie Nowlin, or either of them, as a principal, did, in Comanche County, Texas, make an assault in and upon the person of Meda McDonald with the specific intent to rape her by force within the meaning of the law of rape by force, then he would be guilty of an assault with intent to rape. The court defined to them force, and told them that their intent must have been to have carnal knowledge of the prosecutrix without her consent, and by force, and defined the force to be the use of such means on the part of the assailant as would be sufficient to overcome all resistance within the power of the prosecutrix and to accomplish his purpose at all hazards. The court further directed the jury that they must believe beyond a reasonable doubt that the defendant made an assault upon the prosecutrix with the specific intent to rape her by force before they would be authorized to convict. Complaint is made in motion for new trial, as before stated, that the charge on the subject of principals was incomplete in that the court failed to further charge the jury that before they could convict the defendant of an assault or before they could consider an assault by any of the other alleged principals they must find that a conspiracy or agreement must have been entered into between defendant and one or the other of the alleged principals to commit the crime of rape, and that the defendant was at the time performing some act to carry out the common design and intent of all of said alleged principals; and appellant says this charge ought to have been given because there was an issue as to whether or not defendant was actually and bodily present when prosecutrix was assaulted by White as claimed by her, and if defendant was present the issue was raised as to whether or not there had been an agreement between the defendant and the other alleged prin-

cipals to rape prosecutrix, and as to whether or not the defendant was then performing some act to carry out such design and intent. Counsel proceeds upon the idea that before the defendant could be held guilty in this case, where the proof unquestionably shows that he engaged in the assault and did assault prosecutrix, and that he led the horse down into the pasture, the State must show that there had been a specific agreement antedating the act of the assault. The circumstances surrounding the assault and conduct of the parties at the time of the act may be taken into consideration in determining whether there was an agreement to do the act or not. If the defendant at the time took any part whatever in the transaction, if he did anything in furtherance of the act of White, he would be a principal whether he had agreed before he came there to do a thing or not. In view of the testimony in this case, it was not necessary for the court to have encumbered the case by a charge on a conspiracy, or as to what preceded the occurrences at the time of the assault. The testimony of the prosecutrix unquestionably shows that Ross assaulted her; that White struck her several times; that Ross told her to get out of the buggy, and told her that she had as well submit; when White said he intended to have intercourse with her, Ross spoke up and said that was what they came there for. He seized the bridle reins of the horse and led the horse back into the pasture and down to the creek. And it may be conceded there was no agreement or conspiracy entered into beforehand to do a thing. If appellant was present and engaged in the assault with others, and took part in it, he was a principal, he was the actor, and the charge of the court need not have stated anything about a conspiracy. He was the doer of the act. This made him an offender without reference to any previous agreement or conspiracy. We are, therefore, of opinion that no complaint could be made of the charge upon this ground. A charge on conspiracy would only become necessary if defendant was present when others committed the deed and took no part therein. Then the court would have been compelled to charge upon a previous agreement to commit the offense. It would seem from the character of the cross-examination of the State witness, and in fact it is suggested and relied upon largely by the defendant that their purpose in accosting this young lady on this night was not for the purpose of doing any violence to her, but simply to demand of her an explanation of why she had written such a letter as she did to White, and what she meant by calling White and Ross pikers. In view of the circumstances, to our minds, the story is not only unreasonable, but improbable. Why should Ross and White select this opportunity to demand the explanation? Why should they seek the hour of, midnight for that purpose? Why should they lead her off of a traveled road down to a creek bottom and in the woods to demand this explanation? Why could they not have demanded the explanation at the party that night? When it is considered that this young lady was returning to

her home from a social gathering in the community, and at the hour of midnight she should be waylaid on the side of the road by three young men, putting themselves to the trouble of riding in a different direction from their home to meet her, we think it would be a great task upon human credulity to believe such a story. It sounds unnatural and unreasonable, and the jury were warranted in disbelieving such an improbable story in the face of the uncontradicted and positive testimony of the prosecutrix as to the conduct, acts, declarations and demeanor of the parties on that occasion.

6. The court submitted both assault to rape and aggravated assault to the jury. We are of opinion that the court's charge presented all issues raised by the testimony. We are further of opinion that the testimony shows that the defendant assaulted the prosecutrix, and that his purpose was to have carnal intercourse with her at all hazards, and it is no answer to this to say that subsequent to the assault he abandoned the design. What circumstances may have operated on his mind and on White's mind to desist from this assault and this intent on their part, we know not. Further, it may have been the determined opposition and fighting on the part of the prosecutrix, or the remarks of Nowlin and Stewart, or the prolonged contest and resistance on the part of prosecutrix, which operated upon these parties to abandon the intent. If at the time they struck prosecutrix or seized hold of her they intended to have intercourse with her by force against her consent, and they made the assault upon her for that purpose, the instant that this assault was made with that intent, the crime of assault to rape became complete, and the same could not be defeated by proof that circumstances arose thereafter that made them abandon the intent. We are, therefore, of opinion that there was no error in the trial of this case in the court below; that the State made out a case. To put it mildly, the conduct of these parties was very reprehensible. It is to be deplored that such a thing as this could occur in a country whose citizenship boasts of their chivalry and gallantry. The other questions raised are discussed in the case of White v. State, this day decided.

Finding no error in the trial of the case in the court below, the judgment is in all things affirmed.

*Affirmed.*

[Rehearing denied December 21, 1910.—Reporter.]