## BENIGNO GUERRERO V. THE STATE.

### No. 3348.  Decided December 9, 1914.

**1.—Murder—Evidence—Conversation.**

Upon trial of murder, there was no error in admitting in evidence that, on the day of the homicide, the father of the deceased had a conversation with defendant in which the latter stated that if the deceased would not run away with him, or would give away any of the secrets, he would kill her.

**2.—Same—Evidence—Declarations by Defendant—Declarations by Third Party.**

Upon trial of murder, there was no error in admitting in evidence the declaration by the defendant shortly after the shooting: "In Mexico, they are killing lots of them, why can't I kill one," in answer to a question why he had killed deceased; and a statement by the witness, "For God's sake, what have you done!" being brought out by the defendant, was not reversible error.

**3.—Same—Evidence—Insanity—Acts of Defendant.**

Where, upon trial of murder, the defendant pleaded insanity, and while the jury was in the box would throw his head about, shake his hands and shuffle his feet, evidently to assist his plea of insanity, there was no error in permitting the State to show that these acts of the defendant did not occur when he was not in view of the jury.

**4.—Same—Handcuffs—Practice in District Court.**

Where the record showed that it was customary for the sheriff, in bringing prisoners from the jail to the court room to handcuff them, but to take these off when in the court room, and upon the instant trial, it happened that the jury arrived in the court room before the handcuffs had been removed from the defendant, but it did not appear that the jury saw the defendant handcuffed, there was no reversible error; however, prisoners should never be manacled while being tried. ·

**5.—Same—Insanity—Charge of Court—Burden of Proof.**

Where the defendant pleaded insanity, there was no error in the court's charge instructing the jury that every man is presumed to be sane until the contrary appears to the satisfaction of the jury, as the burden of proof is on the defendant to show that he was insane at the time of the commission of the offense; besides, defendant's requested charge on the subject was given.

**6.—Same—Manslaughter—Charge of Court.**

Where, upon trial of murder, the evidence did not raise the issue of manslaughter, there was no error in the court's failure to charge thereon.

**7.—Same—Circumstantial Evidence—Charge of Court**

Where, upon trial of murder, it appeared that the defendant admitted shortly after the homicide that he did the killing, there was no error in the court's failure to charge on circumstantial evidence.

**8.—Same—Requested Charges.**

Where defendant's requested charges were covered by the court's main charge, there was no error in refusing them.

**9.—Same—Allusion to Defendant's Failure to Testify.**

Where the remarks of the district attorney evidently referred to a conversation had between defendant and the father of the deceased, which was in evidence, it could not be construed into a reference to defendant's failure to testify.

**10.—Same—Misconduct of Jury—Separation.**

Where, upon trial of murder, the defendant in his motion for new trial alleged misconduct of the jury, the evidence with reference to same should have been filed during the term of court at which defendant was tried to authorize a consideration thereof in this court; however, when considered, the matter did not present reversible error, as the alleged separation of the jury would not be deemed so in law.

Appeal from the District Court of Hays. Tried below before the Hon. Frank S. Roberts.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*Louis T. Dugger,* for appellant.—On question of admitting statements of third parties: Jackson v. State, 20 Texas Crim. App., 190; Rush v. State, 76 S. W. Rep., 927; Flanigan v. State, 51 S. W. Rep., 1116.

On question of declarations by defendant: Cain v. State, 18 Texas, 387; Hamlin v. State, 39 Texas Crim. Rep., 579.

On question of misconduct of jury: McCampbell v. State, 40 S. W. Rep., 496; Brown v. State, 38 Texas, 483; Neal v. State, 50 Texas Crim. Rep., 583, 99 S. W. Rep., 1012; Jones v. State, 83 S. W. Rep., 198; Eades v. State, 170 S. W. Rep., 145.

On question of bringing defendant into courtroom handcuffed: Rainey v. State, 20 Texas Crim. App., 455; Powell v. State, 99 S. W. Rep., 1005.

On question of defendant's failure to testify: Hunt v. State, 28 Texas Crim. App., 149.

*C. E. Lane,* Assistant Attorney General, for the State.

HARPER, JUDGE.—Appellant was prosecuted and convicted of murder, and his punishment assessed at death, from which judgment he prosecutes this appeal.

No one saw the actual shooting, now living, other than appellant, and he, as he had a right not to do, did not testify in the case. Appellant had married Catarino Morales, and is charged with having killed a sister of his wife, Isabel Morales, a fifteen-year-old girl. As tending to show a motive for the killing, the father of the two girls, Nicholas Morales, testified that on the day of the homicide he had a conversation with the defendant. That in this conversation he, the witness, told appellant that the girl Isabel had told him that he, defendant, had said to her, "if she, Isabel, would not run away with him he would kill her, and that if she gave away any of the secrets they had between them, he would kill her," when appellant asked if he had any proof in regard to the matter, and when told that the father had, appellant replied, "Well, we will go to law about it." The girl was killed that evening in the field while she was at work. This conversation was objected to, but the court did not err in admitting it as it clearly tended to show the motive of appellant in killing deceased.

Appellant also objected to a conversation had between appellant and Gregorio Valdez shortly after the shooting. Valdez says he heard of the shooting and went to appellant's home, and asked why he had killed the girl, when appellant replied, "In Mexico they are killing lots of them—why can't I kill one?" This was an admission that he killed the girl, and was admissible to prove that fact. It is not contended that he was under arrest at that time—in fact, it is shown by all the testimony that he was not. However, when the testimony was admitted, appellant's counsel cross-examined the witness in regard to this statement, asked the following questions, and elicited the following answers thereto: "Q. State exactly what words you used in that question? A. When I got to the house he was in bed, and I says: 'For God sake—Guerrero, what have you done?' Q. Now, was this answer about killing so many Mexicans in Mexico and about him having a right to kill one, was that the answer to that question—'For God's sake, what have you done?' A. That's what he said,—that's all he said to him."

The State on its direct examination had not elicited the question propounded by appellant to the witness, but merely the statement of defendant, and if the question, "For God's sake, what have you done?" was hurtful, it was elicited by appellant on cross-examination in answer to a direct question.

The defendant's plea was insanity, and he introduced several witnesses to show that the relatives of his mother were insane; that on one occasion he himself attempted to commit suicide, and other facts and circumstances were introduced by defendant on this issue. The State introduced a number of witnesses who testified that appellant was sane. Among other things the record discloses that while the trial was being conducted, and the jury was in the box, appellant "would throw his head about, shake his hands and shuffle his feet." The State introduced witnesses who testified that when the court was at recess and the jury was not present appellant would cease to "throw his head about, shake his hands and shuffle his feet." These antics in the presence of the jury were performed evidently to assist his plea of insanity, and there was no error in permitting the State to show that they did not take place when he was not in view of the jury.

It is shown by one bill that on one occasion the sheriff did not take the handcuffs off the prisoner until the jury was being brought in and were taking their seats. There is nothing in the bill to show that the jury saw the sheriff take the handcuffs off of appellant. The court says it is usual and customary in bringing prisoners from the jail to the courtroom to handcuff them, but when in the courtroom they are taken off. Only in this one instance did the jury arrive in the courtroom before the handcuffs had been removed, and in this instance it is not disclosed that the jury saw that the prisoner was handcuffed. Prisoners should never be kept manacled while being tried, unless absolutely necessary, but the state of facts shown by this bill do not present error.

The only objection urged to the court's charge when presented to counsel for inspection was, "that those paragraphs presenting the issue

of insanity were erroneous in that said charge is upon the weight of the evidence, in that it specifies that such testimony must be introduced before a jury can believe that the defendant was insane at the time of the alleged commission of the offense." We suppose this objection is leveled at that portion of the charge which informs the jury, "that every man is presumed to be sane until the contrary appears to the satisfaction of the jury." That is the law in this State, and the court did not err in so instructing the jury. The burden of proof is on the defendant to show that he was insane at the time of the commission of the offense. In addition to this the court gave the special charge requested by appellant on this issue.

The court did not err in refusing to give the special charge presenting the issue of manslaughter. The only evidence in this case which would indicate the reason appellant killed deceased was, that he wanted her to run off with him and she would not do it; that there were "secrets" between the two he did not wish her to disclose to her parents, and had threatened to kill her if she did tell them, and that she told her parents about the threats, and he feared she would also disclose the "secrets." The girl's father had questioned him about this matter some three hours before the homicide, and the facts would show he went to her while she was at work in the field, placed the muzzle of a forty-five caliber pistol near her temple and bored a hole through her head, she dying instantly. There was no issue of manslaughter in the case. As appellant admitted to Gregorio Valdez he had killed the girl, the court did not err in refusing the charge on circumstantial evidence. It is only when the evidence is wholly circumstantial that such a charge is required.

The other special charges, in so far as they are the law of the case, are fully covered by the court's charge.

In another bill the remarks of the district attorney are complained of. The bill shows that the district attorney made the following remarks: "What did you say when the father of the murdered girl said: 'Benigno, why did you say to Isabel that if she did not run away with you, you would kill her, and if she told what you said, you will kill her?' The district attorney then turned and faced defendant, leveled his finger at him and said: 'Did you deny it? No. You know if it had not been true that you would have denied it then,' and turning to the jury the district attorney continued: 'And, you, gentlemen of the jury, know he would have denied it to his father-in-law, but instead, defendant said, 'If you can prove it go to the law.'" These remarks, as the bill plainly shows, referred to the conversation had between appellant and the father of the girl at the noon hour, and could not be construed into referring to the failure of the defendant to testify.

The only other matter presented by the record that we deem it necessary to discuss is the one that contends that the jury was permitted to separate during the trial of the case. The bill presenting the evidence was not filed until long after the adjournment of court for the term. It should have been filed during term time to authorize us to consider it.

But we have read the evidence heard. It appears that the jury room is upstairs over the District Court room, and that the stairway leading to the jury room is some seven or eight feet from the door of the District Court room. That during a recess of the court the jury retired to their room in charge of an officer. The jury came down the stairs and started to take their seats, when it was discovered that only eleven were present. The sheriff started up the stairway after the other juryman, when he was seen coming down. He explained that he was in the toilet when the other jurymen started downstairs, and he came on as soon as he got out of the closet. The time from the time the eleven jurors came downstairs to the time the last juror was coming down is estimated at from thirty seconds to a minute and a half. The record discloses it was impossible for him to have met any person. This in law would not be deemed a separation, and the court did not err in so holding.

The judgment is affirmed.

*Affirmed.*