CHARLIE JONES ALIAS BUDDY JONES v. THE STATE.

No. 14430. Delivered October 14, 1931.
Appeal Reinstated November 25, 1931.
Rehearing Denied February 17, 1932.

526

The opinion states the case.

*W. H. Russell,* of Hereford, and *Taylor, Muse & Taylor,* of Wichita Falls, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CALHOUN, JUDGE.—The offense is rape; the punishment, confinement in the penitentiary for a period of five years.

The jurisdiction of this court to review the action of the trial court, where the accused is not in jail, is dependent upon a proper recognizance or appeal bond, the requisites as well as the form of which are set out in article 817, C. C. P., Acts of 1925. It is necessary that the recognizance or appeal bond show that the appellant shall obligate himself to appear before the court in which he had been convicted "from day to

day and from term to term of the same". In this case, there is a failure to comply with this requirement in the recognizance.

The appellant being at large under the defective recognizance, this court is without jurisdiction and the appeal must be dismissed.

The appeal will ·be dismissed with permission to correct the fault in the recognizance, under article 835, C. C. P. Upon such correction and notice thereof to this court within fifteen days from this date, the appeal will be reinstated. Following Jones v. State, 110 Texas Crim. Rep., 542, 9 S. W. (2d) 347.

The appeal is dismissed.

*Dismissed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON REINSTATEMENT.

CALHOUN, JUDGE.—The record having been perfected, the appeal is reinstated, and the case considered on its merits.

The offense is rape by force; the punishment, confinement in the penitentiary for five years. The appellant challenges the sufficiency of the evidence to sustain a conviction. The evidence is very voluminous and we deem it only necessary to state a portion thereof.

The prosecutrix testified that she had known appellant for some time; that he had paid attention to her; that on the day of the alleged offense, she and several other girls had played hookey from school; that they had gone down to the camp grounds on the west side of the town of Hereford. That the appellant and other boys were riding in an automobile and asked them if they would go riding with them; they had refused said invitation several times but finally she and Maybelle Witherspoon and Norene Vaughn consented to ride with them if they would get them back to town about the time the schools were supposed to close. She testified that she and the other two girls who went with the boys were dressed in overalls; that when they got in the car with the three boys they thought the boys would take them to town; that after getting into said car and it had started, two other boys jumped on the running board of the car and got in the car; that instead of taking them to town they drove off on a country road and over the protest of the girls refused to take them to town. She testified further ·that after they had gotten out several miles on this side road, some of the boys pulled one of the girls with them out of the car, over her protest, and two of the boys also got out of the car and the car moved on. A little further on the other girl who was with the prosecutrix was also pulled out of the car. She testified that when the girls ·tried to get out of the car, the boys rolled up the windows so as to prevent them getting out. She testified that while

the boys were taking them out on the country road, that one of the girls, Norene Vaughn, threw the hat of one of the boys out of the car for the purpose of trying to force the boys to take them back to town. She testified that after the other two girls had been taken out of the car, they drove on to a point near an old lake near the road; that the boys that were with her were Buddy Jones, the appellant, and one Loys Carmichael; that after the others had gotten out of the car, they tried to get her to take her clothes off; when she refused to do so, they began to take them off; that they did take her overalls and bloomers off and took all her clothes off from her waist down. She resisted and tried to prevent them from doing so. That after they had gotten her clothes off, they stopped the car and Junior Sherman came up to the car in which they were riding; that when they stopped the car again, they began making threats that she had better do it to save her life and said that "if I ever wanted to come to town that I might just as well relent". She testified that Junior Sherman and Loys Carmichael got out of the car and one of them told the appellant, Buddy Jones, to hurry up, it was his time next; that they stayed near the car. After they got out, she stated that appellant tried to have intercourse with her; she testified further that she resisted him all she was capable of doing and begged and cried and told him that she would turn him in, fought him, and used all the strength that she had in her efforts to oppose him, but that the appellant was stronger than she was and held her down on the seat and despite all her efforts he finally had intercourse with her and it caused her to bleed in her private parts. Previous to the occurrence, one of her legs had been broken and she did not have her full strength. She testified further that when the appellant finally quit, she tried to get her bloomers back on her legs and that the appellant got under the steering wheel and Loys Carmichael got in back and Junior Sherman told her "you just as well not put on those overalls; we are not through with you yet", and held her so as to prevent her from doing so. They then drove down the hill and started across the creek; there was a man driving a tractor and she got her head and shoulders out of the car and began to holler for help; the boys started cursing and one of them tried to slap his hand over her mouth and made her nose bleed; that Junior Sherman gave her his handkerchief to wipe her nose. That after she had hollored, she heard one of the boys say, "I wonder if that fellow heard us", and another one of the boys said, "it is none of his business", but that they finally went back to the gate on the main road and picked up the other two boys but did not see the other two girls and did not see them until they started on towards Hereford on the main road. When they got near town, one of the boys got out of the car and the appellant left her down about the railroad crossing. She then went to Norene Vaughn's house and stayed there long enough to change her clothes; she had left her dress there

when she put on the overalls; that she was taken home by a man whose name she had forgotten. After she got home, she told her sister, who saw her crying and asked her what was the matter, and she told her in part what occurred.

Miss Norene Vaughn, a witness for the state and one of the girls who had gone riding in the boys car, testified substantially as the prosecutrix to what occurred up to the time she was taken out of the car. She further testified that after they had taken her and Maybelle Witherspoon out of the car that they had succeeded in getting away from the entire group of boys and went on down to the main road and walked to town. She further testified on cross-examination that that same night after she got back home she saw Etoyle Joiner, the prosecutrix, in town and she looked excited and looked like she was crying; that she told her the way Buddy Jones had treated her and that they had pulled her clothes off of her and that her nose had bled, and that some of the boys held her down and Buddy Jones "got to her" and had intercourse with her. She testified that she was positive what the prosecutrix said to her and that it was serious and made an impression on her mind. That the next morning she saw Etoyle Joner, the prosecutrix, in the office of Elmer Davis, county attorney at that time.

Cordelia Joiner, sister of the prosecutrix, testified that her sister was 16 years old at the time; that when her sister came home the day the offense was alleged to have been committed that she noticed that Etoyle Joiner was nervous, excited, and crying when she came in; that she knew there was something wrong; that she didn't say anything immediately but while the witness was cooking supper that Etoyle Joiner came into the kitchen and told her about it. She gave her the name of all the boys, told her where they took her, and told her about the boys pulling Maybelle Witherspoon and Norene Vaughn out of the car, and that the next morning she had occasion to see her sister's body and limbs and she had bruises on her right limb above her knee; that on her other limb there was a long scratch, and when Etoyle arrived on the night before she complained very much of being sore; that she had occasion to see the pair of bloomers her sister was wearing and they were torn, the seat was almost torn out of the bloomers.

A doctor testified that the next morning after the occurrence, he examined the prosecutrix's private parts and found some laceration and some blood there; he could not tell what the blood was, it might have been menstruation blood and it might not have been, but that it was flowing from the laceration; that it was blood from the laceration; he stated that he could not tell from the examination he made that she had been penetrated by a male organ, but that he could tell there had been some irregularity there and some stretching and tearing of the mucous membrane.

Crockett Bruton, a witness for the state, testified that on the night of the day the offense was alleged to have been committed he had a conversation with Buddy Jones and Jimmie Moore. He stated that he was talking to Jimmie Moore and about that time Buddy Jones, the appellant, walked up and something was said by them about having been out with some girls that afternoon, and appellant told Jimmie Moore that it was a damn lie; that he did not have any intercourse with some girls. He stated that Jimmie had had the intercourse with girls and "it was Jimmie Moore that told me that they were into it." The appellant also stated that they were into it and would have to stand up and take it like a man. The conversation was about 8 or 9 o'clock at night before any of the officers had been after them. That he heard about their leaving town the next day.

All of the boys who were alleged to have been in the party testified and did not deny substantially what was stated by the state's witnesses as to what occurred, except that they denied pulling the girls out of the car and denied knowing whether the appellant had had any intercourse with prosecutrix or not. Loys Carmichael also denied that he and appellant tried to pull prosecutrix's clothes off.

The appellant testified in his own behalf that after the other two girls had gotten out of the car that the prosecutrix and Loys Carmichael and himself then remained in the car and that they went to about one-half mile north and west of where the others had gotten out and stopped the car there. As to what took place, he stated: "Well, I was trying to have intercourse with Miss Etoyle and she told Loys Carmichael that if he would get out she would let me have it, so he got out of the car and she told him to walk down to the corner post and he walked down there, but I did not have intercourse with Miss Etoyle there; she began to beg and plead with me just as soon as Loys got out of the car; I didn't say anything further to her. I just quit and gave it up right then. No sir, I did not take her clothes off. I did take one of her bibs to her overalls down, but I could not go any further then. Then, she got to talking to me and as I have previously stated, I just quit." He also testified that some time previous to that that he had intercourse with prosecutrix at a different time and place.

Bills 1 and 3 are wholly insufficient. They recite that counsel for the state asked prosecutrix if she undertook to tell her sister Cordelia anything about what had happened. The question was objected to on the ground that it was hearsay, and that the state had not shown such communication to be a part of the res gestae. Then follows in each of said bills an inquiry of prosecutrix as to where she had been and what she had done between the time appellant had let her out of the car until she talked to her sister. This is presumably incorporated in the bills to inform this court whether the trial court was correct in admitting in evi-

dence as res gestae what prosecutrix may have told her sister Cordelia. However in neither of said bills is there set out what, if anything, prosecutrix ever told her sister. So far as the bills are concerned they fail to show that prosecutrix ever answered the question propounded by counsel for the state, or if so, what the answer was. A bill complaining of the reception of evidence is defective if it fails to set out the evidence admitted over objection. See Branch's Ann. Tex. P. C., sec. 210, p. 135. Many cases are collated supporting the text. See also section 210, vol. 4, Texas Jurisprudence. See Duncan v. State, 118 Texas Crim. Rep., 253, 37 S. W. (2d) 1034; Wilhite v. State, 116 Texas Crim. Rep., 314, 27 S. W. (2d) 817; Upton v. State (Texas Crim. App.), 20 S. W. (2d) 794.

Bill of exception No. 2 shows that while the jury were out and deliberating, considering their verdict, said jury through its foreman, made the following request in writing and presented same to the court, to-wit: "Are we authorized to recommend a suspended sentence in this case." To which question, the court replied, "No", The bill is qualified by the court without exception to the effect that there had not been filed an application for a suspended sentence. As qualified, no error is shown.

Bill of exception No. 4 showed that the jury trying the case was retired from the court room for some purpose and called back into the court room, at which time only eleven jurors returned. That one of the jurors did not return with the balance of the jury panel and his absence was not discovered until after the balance of the jury panel had been seated in the court room, at which time the court discovered one juror missing and called the sheriff's attention to same. The sheriff directly returned to the juror's quarters at which time he met the juror coming down the stair from the jury sleeping quarters. It is further shown in said bill that the juror Galley, if sworn, would have testified that he saw no person, communicated with no person, received no communication of any kind, read no newspapers, and had no other communication with any person while he was absent from the balance of the jury panel. It is also shown that the said juror was not absent from the other eleven men more than two or three minutes. The bill further shows that the matter was duly presented to the court on motion for new trial and which motion was overruled and was excepted to. From the facts as shown by said bill, we do not believe that he appellant could have suffered injury or prejudice by reason of the separation of the juror from the balance, and that the trial judge did not abuse his discretion in refusing a new trial on that ground.

If the separation of the jury, or of a part of the jury, is momentary only, and it is shown that defendant could have suffered no injury or prejudice thereby, a new trial will not be granted on that ground. Branch's Penal Code, sec. 581, p. 299; Jenkins v. State, 41 Texas Crim.

Rep., 128; Davis v. State, 54 Texas Crim. Rep., 236, 114 S. W., 366; Myers v. State, 65 Texas Crim. Rep., 448; 144 S. W., 1134; Guerrera v. State, 75 Texas Crim. Rep., 558; 171 S. W., 731.

Bill of exception No. 7 complains of the action of the trial court in sustaining the objection made by the state to the following evidence by a Mrs. Clara Shore, after both the state and defendant had rested their main case and the state had offered its rebuttal testimony. The bill shows that if the witness had been permitted to testify, she would have testified that the complaining witness, Etoyle Joiner, boarded and roomed at her home in September, 1929, until about a week prior to February 28, 1930, and that a short time before Etoyle Joiner left the Shore house that Mrs. Shore went into her room and there found on her dresser a pasteboard box and in this shoe box she found a small box containing two condrums called Merry Widows. The bill further shows that upon cross-examination she would have testified that at the time she found said shoe box and condrums, there were four other members of the family, herself, her husband, and two grown daughters, all of whom had access to all of the house; that she never talked to Miss Joiner about it, and did not know of her own knowledge that they belonged to Etoyle Joiner. The prosecutrix not having been asked about the matter sought to be proven, this evidence could only have been offered for one purpose; that is, for the purpose of affecting the character of the prosecutrix for chastity. The charge against appellant, which was submitted to the jury, was a charge of rape by force and under the evidence the issue of consent is not raised. The accused himself testified that the prosecutrix did not consent to his having intercourse with her and that he desisted and had no sexual intercourse with her on the occasion charged in the indictment. We believe the evidence sought to be introduced was inadmissible under the decisions of this court.

We quote from the opinion by Judge Hawkins in the case of Linder v. State, 94 Texas Crim. Rep., 316, 250 S. W., 703, which was a case wherein the defendant was charged with assault with intent to rape. The part of the opinion quoted shows the issue: "Prosecutrix was asked upon cross-examination, if she had ever kissed or permitted any one to kiss her. She admitted having kissed two young men to whom she had been engaged. She denied ever hasing kissed Olan Weems, or having permitted him to kiss her. No objection was interposed by the state to these inquiries of prosecutrix. Appellant proposed to prove by Weems that he had kissed her and she him. Objection by the state was sustained. The bill of exception shows that appellant was offering Weems for the purpose of impeachment, but we understand he contends in his brief that it was also admissible on the issue of prosecutrix's character for chastity. The credibility of a witness cannot be thus attacked. For the latest expressions from this court upon this subject, together with citation of authorities, see Barnes v. State, 90 Texas Crim. Rep., 51, 232 S. W., 312; Hays v.

State, 90 Texas Crim. Rep., 355, 234 S. W., 898. It was no answer to the state's objection that it had permitted the predicate to be laid without protest. It was an attempt to impeach upon an immaterial issue, and the state was not estopped from objection when the traversing testimony was offered. Neither was the evidence admissible upon the issue of the character of prosecutrix for chastity. It must be borne in mind that the charge against accused was assault to rape by force. All the cases cited by appellant (save Norman v. State, 89 Texas Crim. Rep., 330, 230 S. W., 991,) are in prosecutions for seduction. In that offense the previous chastity of the female is directly in issue. In Norman's case he was charged with statutory rape upon a female over 15 years of age, and the statute (article 1063, P. C.,) now makes previous unchaste character of the female a complete defense to such charge, thereby placing cases of that character in a class analogous to seduction. This is not true in rape, or assault to rape by force. As applied to cases of this character, specific acts of misconduct or immorality of the prosecutrix cannot be shown except it may have been with accused. Ross v. State, 60 Texas Crim. Rep., 547, 132 S. W., 793; Lawson v. State, 17 Texas App., 302; Wood v. State, 80 Texas Crim. Rep., 398, 189 S. W., 474; Jennings v. State, 80 Texas Crim. Rep., 450, 190 S. W., 733. In the instant case the issue of consent is not raised. It is excluded by the evidence of accused himself. Steinke v. State, 33 Texas Crim. Rep., 65, 24 S. W., 909, 25 S. W., 287."

The appellant excepted to the paragraph of the court's charge wherein he defined "force" necessary to constitute rape in that the definition used by the court is too restricted. As stated before in this opinion, there was no issue made on the trial below as to the refusal of the prosecutrix to give her consent to any act of intercourse between her and appellant, nor was there any issue as to the lack of resistance on her part. The issue being as to whether there was any act of intercourse at the time alleged. The court charged the definition of "force" in the language of the statute, article 1184, P. C., to the effect that to constitute rape by force the defendant must have ravished Etoyle Joiner, the alleged injured female, by having carnal knowledge of her without her consent and against her will by force and the force used, if any, must have been such as might reasonably be supposed sufficient to overcome resistance, taking into consideration the relative strength of the parties and other circumstances of the case. There being no isue in the case as to the lack of resistance, the definition as given by the court was sufficiently explicit. Anschicks v. State, 6 Texas App., 534; Favors v. State, 20 Texas App., 155; Fitzgerald v. State, 20 Texas App., 294; Jenkins v. State, 115 Texas Crim. Rep., 53, 27 S. W. (2d) 164; Branch's Penal Code, sec. 1780.

Bills of exception 5 and 6 are in question and answer form. No certificate of the trial judge showing the necessity for such forms appear

in the record. When a bill of exception appears in question and answer form, in order to receive consideration, the certificate of the trial judge must show the necessity for such form. Polk v. State, 109 Texas Crim. Rep., 421, 5 S. W. (2d) 149; Houston v. State, 114 Texas Crim. Rep., 544, 26 S. W. (2d) 1066.

While the evidence in this case is conflicting, there was sufficient evidence offered on the part of the state to warrant the trial court in submitting the issue as to the guilt or innocence of the defendant to the jury. The jury having decided adversely to the appellant, we see no just reason to disturb said verdict.

No reversible error appearing, the judgment is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—In the motion for rehearing it is again urged that the evidence is insufficient to support the conviction. Set out in the motion are many excerpts from the testimony of prosecutrix, which taken alone, would cast doubt upon her claim that appellant had intercourse with her. We have again scrutinized the statement of facts, having particularly in mind those parts of prosecutrix's evidence especially stressed in the motion. When taken in connection with her explanation of those very things, and her entire testimony, we think this court would not be justified in disturbing the verdict.

In one part of prosecutrix's testimony given on cross-examination she said: "In response to your question, 'And then you commenced to shove him off and begged him and Buddy says, 'That is all right, if you feel that way about it, I'll quit,' well, I don't know whether he said 'If you feel that way about it, I'll just quit,' but I begged him and asked him to quit and he did quit. When the other boys came to the car, he quit."

From this statement it is urged that no rape is shown to have occurred. The statements of facts reveals that prosecutrix makes no claim that a ravishment resulted from the incident referred to. She says appellant did not on that occasion succeed in his attempt; that by begging and resistance she had persuaded him to desist. We understand from her testimony that when two other boys (appellant's companions) came back to the car, they encouraged appellant to go on with his efforts; and she asked them to go away, believing if they did so she could again prevail upon appellant to let her alone. It is her claim that it was during this second attempt on the part of appellant that he succeeded in penetrating her person despite her resistance and entreaties.

After another careful review of the evidence we see no reason to think our former disposition of the case was erroneous.

The motion for rehearing is overruled.

*Overruled.*